Argued May 5, reversed October 18, 1961

HENZEL ET AL *v.* CAMERON ET AL
365 P. 2d 498

*E. Nordyke,* Assistant Attorney General, Salem, argued the cause for appellants. With him on the brief were Robert Y. Thornton, Attorney General, Roland V. Brown, Ralph W. Taylor and Carlotta H. Sorensen, Assistant Attorneys General, Salem.

*Richard R. Carney,* Portland, argued the cause for respondents. On the brief were Carney & McCarroll, Portland.

Before MCALLISTER, Chief Justice, and ROSSMAN, WARNER, PERRY, SLOAN, O'CONNELL and GOODWIN, Justices.

ROSSMAN, J.

This is an appeal by the defendant, Department of Employment Commissioner, from a judgment of the circuit court which reversed a decision of the Appeals Board of that department. The circuit court directed that the claims of the plaintiffs (employee-claimants) be referred back to the defendant, David H. Cameron, as Department of Employment Commissioner so that he may fix and pay unemployment compensation benefits to the plaintiffs for the period of August 10, 1958, to September 20, 1958, without deeming the plaintiffs disqualified on account of a labor dispute. Hereafter, Mr. Cameron (the defendant-appellant) and the plaintiff-respondents will be referred to respectively as the commissioner and the claimants.

The claimants are employees of trucking firms that operate in Oregon and are members of Teamster unions under the jurisdiction of Joint Council No. 37 which

covers Oregon and some southern Washington counties. Two types or classes of drivers are involved: (1) line drivers (intercity) and (2) terminal drivers (pickup and delivery, intracity). The claimants seek unemployment benefits for the period August 10, 1958, to September 20, 1958, during which they were unemployed because of a lockout effected by their employers who are members of the Truck Operators League of Oregon.

The events leading up to the lockout developed in the following manner. The contracts under which the claimants and the employers had been working expired May 1, 1958. Prior to 1958 negotiations between claimants' employers and the union were on a state-by-state basis. Negotiations for the 1958 contract, however, were attempted by the Western Conference of Teamsters on a multistate basis and sought to effect a master agreement with employers of eleven western states represented by the Western Empire Operators Association.

The negotiations in question were carried on, for the most part, in San Francisco. The goal of the negotiating committees was to arrive at a master agreement, covering non-cost items which would encompass the eleven western states. This master agreement was then to be applied to the respective areas by supplements which would cover the cost items.

It was agreeable to both union and employer representatives to proceed on the master agreement-supplement basis for the long line drivers, but the employers, at the beginning, declined the union's efforts to negotiate for the terminal employees on an eleven state basis.

Negotiations with respect to the master agreement

were almost completed and negotiations regarding the supplemental agreements had been entered into when an impasse was reached with respect to the supplementals on or about May 25, 1958. In an effort to save the negotiations from failure an off-the-record meeting of some of the leaders in the negotiations was held and as a result a proposal in the form of a memorandum was submitted to the group present in San Francisco on May 27, 1958. It was at this juncture in the negotiations that the employers state that the negotiations for the terminal drivers swung over to an eleven state basis, for the May 27 memorandum applied specifically to terminal as well as long line drivers. The May 27 memorandum applied to all of the eleven western states.

The group in San Francisco accepted the May 27 memorandum and agreed to submit it to their respective memberships. Voting on this memorandum was conducted as follows: (1) line drivers: vote of all union members in the eleven western states, majority to rule; (2) terminal drivers: vote to be on a local area basis. The Oregon employers accepted the May 27 memorandum as did the terminal locals in Oregon. The Oregon line drivers voted against the memorandum, but as it was accepted by a majority of the line drivers in the eleven western states, it was deemed accepted by all. Various areas, such as the Oakland and the Sacramento areas, rejected the May 27 memorandum with respect to terminal drivers.

In San Francisco the Western Conference of Teamsters and the Western Empire Operators Association had agreed that they would meet in Seattle in June of 1958 to conclude formally all the agreements at the same time. However, when it developed that some areas had refused to accept the terminal contract as it

was set out in the memorandum of May 27, the employers, comprising the Western Empire Operators Association, refused to conclude the agreements when they reached Seattle.

No further negotiations on an eleven state basis were held in June or July of 1958—the employers stood on the May 27 memorandum. July 25, 1958, the Oakland local union went on strike for approximately a week due to a dispute over the terminal drivers' agreement. Long line operations throughout the eleven western states continued during this strike. Shortly thereafter the employers heard "rumbles" that there was a possibility of a strike occurring in the Sacramento Valley area by one of the locals due to a dispute its members were having over the pickup and delivery agreement. The Vice Chairman of the Western States Employers Negotiating Committee, in response to the rumors of a strike, sent a telegram August 4, 1958, to the unions in the eleven western states which declared the employers' policy that "a strike against one is a strike against all." August 11, 1958, seven days after the telegram was sent, the members of Joint Council No. 38, which includes the Sacramento and San Joaquin Valley areas of California, went on strike because of a dispute over the terminal drivers' contract.

The employers, including the Truck Operator League of Oregon, on August 11, 1958, invoked their policy of "a strike against one is a strike against all" as they had warned they would. Normal operations were closed as soon as the docks had been cleared and on-the-road freight delivered, except for some emergency hauling permitted by the League. Throughout the lockout the claimants were ready and willing to work and needed no permission from their local unions to accept work. But for the lockout work would have

been available to the claimants to the same extent as prior to the lockout.

On September 18, 1958, a stipulation was entered into by the parties and the lockout was terminated. Pursuant to the stipulation final agreements were entered into to become effective May 1, 1958. There are several differences between the May 27 memorandum and the final agreements with respect to both the line drivers and the terminal drivers. The differences with respect to the line drivers' contract were: (a) a cost-of-living clause was added to the final agreement; (b) a delay in the employer increase in health and welfare benefits until July 1, 1959; (c) an additional week's vacation after twelve years' service was added. Regarding the terminal drivers the differences were: (a) the wage formula of 10-10-10 was changed to 10-10-4-4; (b) a cost of living clause was added; (c) an additional week's vacation after twelve years of service was added.

The claimants sought unemployment benefits for the period August 10, 1958, to September 20, 1958. Their claims were denied by deputy decisions which found that their unemployment was due to a labor dispute in active progress at the place of employment. The claimants appealed from the deputy decisions and a hearing was had before an appeals referee of the Department of Employment. Two separate referee decisions were entered, one concerning the line drivers and the other concerning the terminal drivers, each of which affirmed the deputy decisions. Thereafter application was made by the claimants for review by the Appeals Board of the Department of Employment. On January 26, 1960, the Appeals Board entered a decision which affirmed that of the referee; it held that a labor dispute existed and that all of the claimants were un-

employed in the period of August 10, 1958, to September 20, 1958, because of a labor dispute in which they were "directly" interested. It further held that the labor dispute disqualified the claimants from receiving unemployment compensation under the purview of ORS 657.200(1) which provides as follows:

> "An individual is disqualified for benefits for any week with respect to which the commissioner finds that his unemployment is due to a labor dispute which is in active progress at the factory, establishment or other premises at which he is or was last employed or at which he claims employment rights by union agreement or otherwise."

Claimants then sought judicial review in the circuit court. August 23, 1960, that court reversed the decision of the Appeals Board and referred the claims back to the commissioner. The circuit court, while agreeing that the claimants had been unemployed due to a labor dispute, held that a proper interpretation of the act exempted the claimants as not "directly" interested and, therefore, pursuant to ORS 657.200(3) were not disqualified from receiving unemployment compensation. ORS 657.200(3) declares:

> "This section does not apply if it is shown to the satisfaction of the commissioner that the individual:
>
> "(a) Is not participating in or financing or directly interested in the labor dispute which caused his unemployment; and
>
> "(b) Does not belong to a grade or class of workers of which, immediately before the commencement of the labor dispute, there were members employed at the premises at which the labor dispute occurs, any of whom are participating in or financing or directly interested in the dispute."

It is from this judgment that the defendant commissioner appealed.

The circuit court, while holding in favor of the claimants, nevertheless agreed with the commissioner that the lockout constituted a labor dispute. The claimants, however, continue to claim that the lockout was not a labor dispute in active progress at the place of employment of the claimants.

■ Authority for the proposition that a lockout is a labor dispute is convincing. While the term "lockout" is not specifically defined in the Oregon statutes, ORS 657.195 provides that benefits under the Unemployment Compensation Act shall not be denied any individual, otherwise eligible, who refuses to accept new work "(a) If the position offered is vacant due directly to a strike, lockout or other labor dispute." That section of our laws, by placing the word "lockout" in the same sentence immediately following the word "strike" and just preceding the words "other labor dispute" renders it evident that a lockout is a labor dispute.

■■ The pertinent Oregon statutes do not seem to require that the labor dispute be between the employer and the claimant himself. In view of the statutory provisions for exception from disqualification, the only reasonable construction is to hold that there is no such requirement. If construction were otherwise, the provisions in ORS 657.200(3), supra, would be superfluous. If a claimant had to be personally engaged in a labor dispute he would be unable to show that he was not "participating" or "directly interested" in such dispute.

Unemployment Benefits And The "Labor Dispute" Disqualification, 17 University of Chicago Law Review 294, states:

> "Nearly all of the fifty-one statutes employ the term 'labor dispute' or its equivalent, but only a few attempt any definition or limitation of those

words. However, one clue as to meaning has been inserted in every statute in order to satisfy the minimum requirements of the federal Social Security Act. The state statutes provide without exception that benefits shall not be denied to an otherwise eligible employee if he refuses to accept new work when the position offered is vacant due to a 'strike, lockout, or other labor dispute,' such a job not constituting 'suitable work.' This phrase indicates not only that 'strikes' and 'lockouts' are species within the genus 'labor dispute' but also that a statutory 'labor dispute' may exist in the absence of the strike or lockout manifestations.

\* \* \*

"Even more important from a practical view, the device of narrow interpretation cannot make itself felt in any significant class of cases. Lockouts, like strikes, could not be excluded from the labor-dispute category unless a court indulged in distortion rather than definition. \* \* \*"

A comprehensive treatise entitled "Unemployment Compensation During Labor Disputes" in 37 Nebraska Law Review 668, declares:

"\* \* \* there is nothing in the language of labor-dispute disqualification provisions of most statutes which justifies differentiation in eligibility for benefits on the basis of the cause of the work stoppage, *so long as the stoppage is due to a labor dispute*; courts which hold claimants not disqualified in the event of lockouts, are therefore, reading into the statute a requirement that the act which proximately precipitates the work stoppage must be voluntary so far as the employees are concerned. \* \* \*"

An annotation in 28 ALR2d 287, 312, states:

"Under statutes containing no express exception of 'lockouts' from the operation of labor dispute disqualifications it is generally agreed that a

work stoppage resulting from a lockout is a labor dispute entailing disqualification."

The Labor Dispute Disqualification which appears in 8 Vand Law Review 338, 342, notes:

"* * * a lockout is considered to be a labor dispute except in those states which specifically exclude lockouts from the application of the labor dispute disqualification."

Other jurisdictions, with unemployment compensation acts similar to Oregon's, which refer specifically to a lockout as a labor dispute, are *Adkins v. Indiana Employment Security Division*, 117 Ind App 132, 70 NE2d 31; *Depaoli v. Ernst*, 73 Nev 79, 309 P2d 363; *Schoenwiesner v. Board of Review*, 44 NJSuper 377, 130 A2d 648; *In re North River Logging Co.*, 15 Wash 2d 204, 130 P2d 64.

Thus, the lockout in question constituted a labor dispute in active progress at the premises where the claimants were employed.

The circuit court decision which awards the claimants unemployment compensation benefits is based upon ORS 657.200(3), quoted in a preceding paragraph of this opinion. That section of our laws states that an individual is not disqualified for unemployment compensation "if it is shown to the satisfaction of the commissioner" that he (a) did not participate in, finance, or was not "directly interested in the labor dispute" and (b) did not belong "to a grade or class of workers * * * any of whom are participating in or financing or directly interested in the dispute."

■ The circuit court referred to the matter of the claimants' "direct interest" in the labor dispute as a question of law and not one of fact. This, we believe, was error.

■■ Whether a finding is a "finding of fact" or a "conclusion of law" depends upon whether it is reached by natural reasoning or by fixed rules of law. Where the ultimate conclusion can be arrived at only by applying rules of law the result is a "conclusion of law." *Mallinger v. Webster City Oil Co.*, 211 Iowa 847, 234 NW 254. A "finding of fact" is a conclusion drawn by way of reasonable inference from the evidence. *State Acting By and Through Oregon State Board of Higher Education v. Cummings*, 205 Or 500, 288 P2d 1036; *Griffith v. Gardner*, (9th cir.) 196 F2d 698.

There are no rules of law to be applied in determining whether or not these claimants were directly interested in the labor dispute. Such a determination can be arrived at only by an examination of the facts. Therefore, when the commissioner found that the claimants were "directly interested" in the labor dispute which caused their unemployment, he had made a "finding of fact" based on the evidence, and not a "conclusion of law."

Further, the commissioner, in finding that the claimants were directly interested in the labor dispute, also found by necessary implication that the claimants had not sustained the burden of proof placed upon them by ORS 657.200(3) to show that they were not directly interested. This, likewise, is a finding of fact. *Mancuso v. Mancuso*, 150 Pa Super 22, 27 A2d 779.

■ The reviewing court's function as to the commissioner's findings of fact is limited. ORS 657.285(5) provides, in part:

"In any judicial proceeding under this section, the findings of the Appeals Board as to the facts if supported by evidence, in the absence of fraud, are conclusive, and the jurisdiction of said court shall be confined to questions of law. * * *"

This statute codifies a rule basic and fundamental to administrative law. In effect, the findings of fact by the commissioner should be given the same weight as that given to the verdict of a jury.

Thus, since there is no allegation of fraud in this case, the sole remaining question for decision is whether the finding of the commissioner that the claimants were "directly interested" in the labor dispute is supported by substantial evidence.

■ Generally, any reasonable evidence will be regarded as substantial. Substantial evidence, however, is more than a scintilla. It is such proof as a reasonable mind would employ to support a conclusion. *Consolidated Edison Co. of New York v. NLRB*, 59 S Ct 206, 305 US 197.

■ An examination of the record reveals that there is substantial evidence to support the commissioner's finding that the claimants were "directly interested" in the labor dispute. The long line drivers' contract was definitely being negotiated on an eleven state basis which affected all of the claimants in that class. There is also evidence that the pickup and delivery master plan was being negotiated on an eleven state basis, since the May 27 memorandum refers specifically to terminal drivers as well as long line drivers in relation to a common wage pattern. Mr. Long, Secretary of the Truck Operators League of Oregon, explained the wage pattern as follows:

> "* * * in other words, if I can explain it, the city pickup and delivery agreement in Los Angeles, Phoenix, Portland or Seattle was to have X number of cents per hour added to the rates in existence under the old contract."

There was no consummation of any contracts between the claimants and their respective employers

during the lockout in question. Therefore, during the lockout, all the claimants were interested in reaching a settlement either on a multi-state or local basis.

Only after the strike in California came to an end, which in turn caused the employers to terminate the lockout in Oregon, did the parties arrive at a formal contract. It is evident therefore, that since the contract consummated after the labor dispute differed from the agreement contemplated before the labor dispute, that the hours, wages and working conditions of the claimants were at stake during this critical period.

■ An individual is deemed "directly interested" in a labor dispute when his wages, hours or conditions of work will be affected favorably or adversely by the outcome. *Auker v. Review Board, Etc.*, 117 Ind App 486, 71 NE2d 629; *Martineau v. Director of Division of Employment Sec.*, 329 Mass 44, 106 NE2d 420; *Chrysler Corporation v. Smith et al.*, 297 Mich 438, 298 NW 87, 135 ALR 900. In *Chrysler Corporation v. Smith et al.*, (supra) the court quotes with approval the following language:

> "The rule is too well settled to be questioned that a labor dispute that affects the wages, hours of work, and general conditions of employment, causes all employees concerned to be directly interested."

The fact that there is other evidence which might support a different conclusion in the eyes of the reviewing court is immaterial. To annul the commissioner's finding of fact solely on the ground that the evidence would have warranted a different finding would be to substitute the judgment of the court for the judgment of the commissioner—and this can not be done. The appraisal of the evidence and the inferences to be drawn therefrom are for the commis-

sioner, not the courts. The finding of fact by the commissioner that the claimants were "directly interested" in the labor dispute, since supported by substantial evidence, is conclusive upon the reviewing court.

Thus, since there was a labor dispute and substantial evidence supports the commissioner's finding that the claimants were directly interested in it, they are disqualified from receiving unemployment compensation as directed by ORS 657.200. *Teamsters v. Board of Review,* 10 Utah 2d 63, 348 P2d 558, reached the opposite result. It, however, ruled:

> "Cognizant of the rule that we do not disturb the findings and order of the Industrial Commission if there is substantial basis in the evidence to support its action, we nevertheless conclude that the order denying plaintiffs unemployment compensation should be, and it is, reversed."

It is conceded that unemployment due to a labor dispute may seem "impersonal" to the individual worker when he has no selfish interest in the outcome of the dispute; but so long as he is a member of a labor movement whose leaders embrace the causes of economic strife in their dealings with management, he must also accept the attending hardships inherent in such activity.

The appellants' first assignment of error is meritorious and is sustained. The remaining assignments of error, therefore, do not demand consideration.

Reversed.