Submitted February 5, affirmed May 5, 1965

# BAKER ET UX *v.* CAMERON
### 401 P. 2d 691

Frank W. King, Portland, for appellants.

Robert Y. Thornton, Attorney General, and E. Nordyke, Assistant Attorney General, Salem, for respondent.

Before McAllister, Chief Justice, and Perry,

SLOAN, O'CONNELL, GOODWIN, DENECKE and HOLMAN, Justices.

DENECKE, J.

Plaintiffs Met-All are in the home improvement contracting business. The issue is whether they must pay unemployment taxes on moneys paid for services to salesmen and applicators selling and installing roofing and siding; or, stated differently, whether the services performed by such salesmen and applicators constitute "employment" within the meaning of the Unemployment Compensation Act. The period involved is prior to the effective date of ORS 657.087 which exempted, among others, commissioned salesmen of roofing and siding. See *Premier Products Co., Inc. v. Cameron,* 240 Or 123, 400 P2d 227 (1965).

ORS 657.040 provides:

"Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the commissioner that:

"(1) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(2) Such individual customarily is engaged in an independently established business of the same nature as that involved in the contract of service."

The Commissioner of the Department of Employment, acting pursuant to ORS 657.672(1), made a determination that the services of the salesmen and applicators constituted "employment" within the meaning of the above-quoted statute. Pursuant to ORS 657.672 (since repealed) the employer applied for a

hearing to review that determination. A referee held such hearing and the Commissioner affirmed his initial determination. After judicial review of the Commissioner's decision was commenced and the court ordered the taking of additional evidence, a second hearing was held, and the referee again affirmed such decision. (The authority of the referee, rather than the Commissioner, to make the second decision was not challenged.) The circuit court affirmed both decisions.

■ The first question is: What is the scope or extent of judicial review? The Administrative Procedures Act does not create a standard for judicial review; therefore, the extent of judicial review is dependent upon any legislative direction contained in the Unemployment Compensation Act and judicial precedents not in variance with any such legislative direction. (See ORS 183.480, as amended by ch 449, Oregon Laws 1963, on applicability of Administrative Procedures Act.)

ORS 657.683(10) (then ORS 657.672) provides:

"In any judicial review under this section the findings of fact of the referee [then Commissioner] if supported by evidence in the absence of fraud are conclusive and binding upon the court and the jurisdiction of the court shall be confined to questions of law. * * *"

The evidence was uncontradicted. All the witnesses called on the issue were salesmen and applicators called by Met-All. The "FINDINGS OF FACT AND DECISION" of the Commissioner consisted of a summary of the testimony and a concluding statement, as follows:

"The above statute [ORS 657.040, above quoted] contains the sole test permitted by Chapter 657 for the relationship of 'independent contractor'. Under

that test both factors in (1) and (2) must be clearly and satisfactorily established before the exclusion may be applied. We find, from the evidence available, that it is not satisfactorily established that the services of the individuals in question come within the exclusion of ORS 657.040."

The referee in affirming the Commissioner's findings, stated:

"The evidence plaintiffs have produced is insufficient regarding the services of any of the salesmen or applicators to establish that such services are excluded as employment under either ORS 657.040, or under any of the other exclusions in Chapter 657 ORS, during the periods in issue.

"We therefore conclude that the Commissioner's Findings of Fact and Decision No. 62-C-30, dated and entered April 24, 1962, should be affirmed without modification."

■■ The Commissioner's decision is stated in terms of a "findings of fact"; however, it has a clear law tint. The distinction between the "findings of fact" of an administrative body, which are not subject to judicial judgment if supported by evidence, and "questions of law," which are subject to judicial judgment, is difficult to make. In *Journal Pub. Co. v. State U. C. Com.,* 175 Or 627, 633, 155 P2d 570 (1945), control under the Act was in issue. The Commissioner's "finding" was:

"* * * The Commission finds in these matters that any established exercise of material direction and control by such district manager did not actually go beyond the insistence that claimant fulfill the obligations of the written terms of his agreements."

We commented:

"This, of course, is not a finding of fact binding on this court, but a conclusion of law based on the

Commission's interpretation of the contract; and it is our opinion that the evidence discloses that in some of the particulars enumerated the control exercised by the plaintiff over Johnston's services did in fact go beyond the provisions of the contract." (175 Or at 665)

On the other hand, in *Henzel v. Cameron*, 228 Or 452, 462-463, 365 P2d 498 (1961), the Commissioner interpreted another section of the Act. The statute, ORS 657.200(3), provides that claimants unemployed due to a labor dispute shall not be disqualified from receiving unemployment benefits if they were not "directly interested in the labor dispute." The trial court held a "finding" that the claimants were "directly interested" in the labor dispute was a decision on a question of law and reversed the Commissioner. We stated categorically that the Commissioner's determination was a " 'finding of fact' based on the evidence, and not a 'conclusion of law.' " (228 Or at 463)

There is doubt whether the distinction between questions of fact and questions of law can ever accurately be drawn upon a conceptual or analytical basis. See 4 Davis, Administrative Law Treatise, ch 30 (1958). However, this court has a consistent line of precedents holding that if the facts are not disputed, the question of whether one is an "employee" or the contractor of another is a question of law. *Journal Pub. Co. v. State U. C. Com.*, supra, is such a precedent interpreting the Unemployment Compensation Act. *Rahoutis v. Unemployment Commission*, 171 Or 93, 112, 136 P2d 426 (1943), is in accord. *Wallowa Valley Stages v. Oregonian*, 235 Or 594, 600, 386 P2d 430 (1963), is a common-law decision. There, we stated: "Whether or not a given person is the servant or the contractor of another is ordinarily a question of law, where the facts are clear."

■■ We hold that the Commissioner's decision is the determination of a question of law and, therefore, independent judgment can be exercised upon judicial review. Despite this power, the decision of the administrative agency in this particular instance should be given some consideration as the answer to this question of law is in some degree dependent upon the general purpose behind the entire principle of unemployment insurance, a subject in which the Commissioner should have some expertise. *Rogers Const. Co. v. Hill,* 235 Or 352, 356, 384 P2d 219 (1963).

■ Another portion of the statute which may be thought to have significance is that part of ORS 657.040 (previously quoted in full) which provides that services are employment "unless and until it is shown *to the satisfaction of the commissioner* that:" (1) the person is free from control; and (2) is in an independently-established business. (Emphasis added.) This clause is common to many states' unemployment compensation statutes; however, no judicial interpretations have been found. In *National Ass'n, Etc. v. Securities and Exchange Com'n,* 143 F2d 62, 66 (3d Cir 1944), similar language in the Securities and Exchange Act was interpreted. The court held:

> "* * * What the statute requires is that the applicant exchange shall present substantial evidence to the Commission of the existence of the conditions prescribed by the Section and if such evidence is presented to it the Commission must extend the privilege. * * *"

We concur in such belief. We construe this portion of the Act as placing the burden of persuasiveness upon one claiming that services performed are not employment, but we do not construe it as granting to the Commissioner the power to be arbitrary.

The evidence presented to the referee and upon which the trial court made its decision is as follows: Met-All obtains most of its jobs through salesmen who have been in this business for a substantial time. They call on homeowners and endeavor to sell a roof or siding job. They have promotion or building material supplied by the manufacturers. They evidence sales by a written contract. They carry the contract forms of several material suppliers, including Met-All, which name the supplier as contractor. Sometimes they use forms naming no supplier.

The salesmen do business with several material suppliers; one stated with four and another with six. It is not clear what considerations lead the salesmen to select a supplier for a particular job. In some instances the customer indicates a preference; in others, it is because a certain supplier does business in a geographical area. One salesman testified: "If you get a good arrangement with one company it isn't necessary to throw business every place, but once in awhile—." This salesman sold about 40 or 50 jobs in the year before he testified, and made more contracts for another company than for plaintiffs. Another salesman had secured 75 contracts in the last nine months—55 with plaintiffs and the balance with four or five other companies.

The salesmen sometimes employ canvassers who seek out prospects. Some salesmen advertise either by newspaper or direct mail. The advertisements do not mention plaintiffs or any other material supplier; they may state the name of a material manufacturer. The car used by the salesman in his work carries no name. His office is always his home.

After a salesman secures a contract, he takes it to the supplier, who either accepts or rejects it. Ap-

parently, the two principal considerations are the price and the customer's credit. The price has been already fixed by the salesman in his negotiations with the customer. There is no written contract between the supplier and salesman. The usual arrangement is two-thirds of the profit to the salesman and one-third to the supplier. The salesman bears all his selling expense,—car, canvasser, advertising, etc.

The supplier lines up an applicator and delivers the materials to the job site. The salesman usually drops by the job while it is in progress to see that the customer is "happy." Customer complaints are taken up by the salesman with either the applicator or supplier, depending upon their nature. Payment for the work is made by the customer to the supplier. Sometimes the salesman delivers the check to the supplier. The salesman receives no draw from the suppliers, but some occasionally obtain a short-term loan at no interest. If a job results in a loss, this is borne two-thirds by the salesman and one-third by the supplier.

All witnesses testified that Met-All exercised no control over the salesmen.

The roofing or siding is put on by applicators who have been in home improvement work for a substantial time. They get their work by being called by the suppliers or by their calling the suppliers. Applicators are paid on a piece-rate basis, so much per square-unit of material applied. The applicators frequently work in a two-man partnership, splitting the pay 50-50; they have no employees. They furnish their own tools and pay their own expenses.

The applicators will usually not work upon more than two jobs at the same time. These jobs may be for two different suppliers. The amount of work done by the applicators for Met-All varied from year to

year among applicators. The applicator who testified in the most detail stated that in the year prior to his testimony, half of his work was for plaintiffs. Applicators may stay with one supplier as long as such supplier has work.

The specifications for the work are fixed by the supplier. The applicators sometimes reject contracts offered by suppliers. They have the right to and do subcontract a complete job to others. The supplier does not set the hours to be worked by the applicators or a time for completion of the job. However, the applicators pointed out that if the jobs were unduly delayed or not performed satisfactorily, they did not receive any more contracts from that supplier. When an applicator starts to do work for a supplier with whom he has not before worked, the supplier will come around and check; after that initial period the supplier does not come to the jobs. The applicators also do other types of home improvements such as building additions on homes.

No advertising is done by the applicators except a telephone listing. They carry no name on their trucks. If there is a sign on the job it is that of the supplier or material manufacturer. One applicator testified: "I could not advertise myself because the different companies I subcontract from might feel I was infringing on their rights, * * *."

In the referee's decision on remand there was a finding that eight of the 44 men who worked for plaintiffs as salesmen or applicators had subsequently at one or more times applied for unemployment compensation. (The evidence shows nine.) The referee stated:

"The above facts are sufficient to disclose that these individuals are subject to the hazards of unemployment and that they considered themselves

to be in employment rather than in an 'independently established business' as required by ORS 657.040."

The exhibit upon which the referee bases his findings contains detailed information about seven of these men who filed a total of 13 claims. This shows that in the year prior to the date on which the clamis for compensation were filed, the base year, these men were paid on the average of about $5,000 by concerns that regarded them as employees and, therefore, reported their earnings to the Department of Employment. The individual earnings ranged from $1,450 to $9,200 per base year. During these base years six men had worked for only one concern, four for two concerns, two for three concerns, and one for four concerns. (They may have worked for others who did not report their earnings.) Met-All reported some wages paid during the base year of one claimant.

The before-quoted statute stating the test to determine whether service is "employment" has been a part of Oregon law since 1937 (Oregon Laws 1937, ch 398, § 1). On four occasions this court has held that the services of those claimed to be independent contractors was "employment." *Singer Sew. Mach. Co. v. State U.C.C.,* 167 Or 142, 103 P2d 708, 116 P2d 744, 138 ALR 1398 (1941); *Rahoutis v. Unemployment Commission,* supra (171 Or 93); *Journal Pub. Co. v. State U. C. Com.,* supra (175 Or 627); *Unemployment Comp. Com. v. Bates,* 217 Or 121, 341 P2d 119 (1959); see, also, *Unemp. Compensation Com. v. Brown,* 225 Or 306, 358 P2d 502 (1960). However, the facts in each of those cases are materially different from those in the present case.

The Commissioner has cited *Twentieth Century Lites v. California Dept. of Employ.,* 28 Cal2d 56, 168

P2d 699 (1946), and *Leach v. Board of Review of Industrial Com'n*, 123 Utah 423, 260 P2d 744 (1953), as persuasive decisions from other jurisdictions. However, the facts in these case are also materially different.

■ The Oregon statute has two criteria for determining whether or not these services are "employment"; both must be met to gain exemption. Does the person work free from the control of the alleged employer and is he "customarily" engaged "in an independently established business"? ORS 657.040. This latter criterion is found in many state unemployment compensation acts and is commented upon as follows:

"* * * Given full scope, it requires not only that the worker be himself an entrepreneur, but also that the service be rendered by him in that capacity; and it thus approaches, as nearly as a formal test can approach, the economic line that bounds the risk of unemployment. The double requirement, that the worker's occupation be 'independently established' and that he be 'customarily' engaged in it, clearly calls for an enterprise created and existing separate and apart from the relationship with the particular employer, an enterprise that will survive the termination of that relationship. * * *" Willcox, *The Coverage of Unemployment Compensation Laws,* 8 Vand L Rev 245, 264-265 (1955).

In discussing the factors to be considered in determining whether the individual is engaged in an "independently established business" the same author states:

"* * * Most important for unemployment compensation are those factors—investment, good will, an independent clientele, and the like—which enable the worker to continue in business if he loses a particular customer, and which thus prevent that

loss from rendering him unemployed. * * *"
(Willcox, supra, at 265)

■ The testimony of plaintiff Harry Baker and the salesmen and applicators furnishes strong support for the view that these workers are individual entrepreneurs, contracting with any and everyone who wanted their services; examples of free enterprise who are not dependent upon any employer to stay out of the ranks of the unemployed. The Commission's records, however, reveal a different picture. They show that a substantial number of these men are not "customarily" entrepreneurs, "engaged in an independently established business." They "customarily" work for only one, two or three employers. When work for such employers is not available these men become unemployed.

As stated earlier, the courts do pay some deference to the decision of an administrative agency on an issue such as this; exactly how much we do not here need to decide. We hold that the Commissioner was clearly justified in determining that the services of the salesmen and applicators performed for plaintiffs was "employment."

The other assignments of error are that the proceedings were not in accordance with the statute. We find no error.

Affirmed.