Argued April 3, reversed June 2, 1967

KIRKPATRICK, *Respondent, v.* PEET,
*Appellant.*

428 P. 2d 405

*Clarence R. Kruger,* Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Robert Y. Thornton, Attorney General, and E. Nordyke, Assistant Attorney General and Chief Counsel for Department of Employment Commissioner, Salem.

*Randall S. Jones,* Portland, argued the cause for respondent. On the brief were Garthe Brown and James R. Carskadon, Jr., Portland.

Before PERRY, Chief Justice, and McALLISTER, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

O'CONNELL, J.

This is an appeal by J. N. Peet, Department of Employment Commissioner, from a decree of the Circuit Court for Marion County declaring that plaintiff was not an employer subject to the Unemployment Insurance Act (ORS Ch 657). The decree reversed the Department's decision that the services performed by certain individuals for plaintiff constituted employment within the meaning of ORS Ch 657.

Plaintiff is the distributor for Kirby vacuum cleaners and accessories in Benton and Linn Counties. The merchandise was sold through the efforts of door-to-door salesmen. The Department contends that an employer-employee relationship existed between plaintiff and the salesmen. The trial court held that the relationship was that of vendor-vendee, i.e., that the salesmen were independent contractors. The question on appeal is whether there was sufficient evidence to support the Department's "Finding of Facts and Decision," that an employer-employee relation was created.

The persons employed by plaintiff to sell its merchandise are obtained by various means, including newspaper advertising inviting persons to apply for a position as "dealer" for plaintiff. If the dealer is found to have the requisite qualifications, a written contract is entered into which, after reciting that plaintiff, described as the distributor, is "engaged in the business of selling at wholesale Kirby Home Renovation Systems" and the dealer wishes "to engage in the business of buying and selling at retail such products," provides that the dealer agrees to purchase from the distributor and the distributor agrees to sell to the dealer the Kirby "system" including parts and accessories. The dealer agrees that he will not sell vacuum cleaners other than Kirby; that he will sell at the list price established by the Kirby factory; that he will not make any representations to prospective customers with respect to the Kirby products other than those authorized by the manufacturer; that he will not be subject to any control of the distributor whatsoever in the manner in which he conducts his business, and that he will promptly pay all obligations to government agencies arising out of the conduct of his business. It is further agreed that the dealer may make payment for the merchandise by paying cash or by selling and assigning to the distributor any conditional sale contract taken by the dealer on the sale of the merchandise. The contract recites that the dealer requests the distributor to maintain and carry for the dealer without charge the bookkeeping and accounting systems necessary to conduct his business.

It was disclosed at the hearing that the newly-selected dealers attended an indoctrination course conducted in Portland at plaintiff's expense.

The dealer's remuneration was the difference be-

tween what he paid the plaintiff and the price for which the machine was sold to the customer. Plaintiff advertised the Kirby cleaners and when inquiries were made at his office, appointments were made for the dealers on a rotation basis. Plaintiff frequently went with dealers to observe the dealer's method of selling and to make suggestions for improvement in selling techniques.

It was the general practice for the dealers to assign the conditional sales contracts to plaintiff. The dealers did not maintain offices of their own but worked out of their homes. It appears that they used plaintiff's office as the principal base for carrying on the details of their business. One dealer testified that he tried to drop in at plaintiff's office at least once a day and that if he was to be away for an extended period of time he would notify plaintiff. When asked if they felt that they had a business which could be sold to someone else the dealers answered in the negative.

In explaining how a sale on credit was handled, one of the dealers explained that if a customer's down payment was by check, it would be made payable to plaintiff. The check would then be turned in to plaintiff's office, whereupon the dealer would receive his "commission." When asked, "Why is it [the check] made out to them rather than to you as an individual," the dealer replied:

"A  Well, it is just simpler that way as far as everything goes; as far as my commission is concerned, and everything else.

"Q  If it does bounce you don't have to stand for it?

"A  No."

The dealer further testified as follows:

"Q  Now, most of these cleaners are sold on a conditional sales contract—is that correct?

"A  Yes.

"Q  What do you do with the conditional sales contract after it has been—after you have obtained the credit statement and the note and everything—what do you do with those?

"A  I turn everything in to the Albany office, and they run it through and check out the credit and so forth.

"Q  You don't do any financing yourself?

"A  No, I don't.

"Q  Have you ever gone through a finance company yourself? I mean, to finance a sale of one of these cleaners?

"A  No; no, I haven't."

The dealer also testified as follows:

"Q  Do you have a place of business separate and distinct from the Albany office?

"A  No, I don't.

"Q  Do you use, oh, brochures, pictures, things like that, in your sales presentation?

"A  Once in a while; not all the time, but once in a while.

"Q  Who furnishes those?

"A  The Kirby Company furnishes all the literature if we want it  *   *   *.
"*   *   *   *   *

"Q  Mr. Yost, when you filled out these credit statements for someone that had bought a machine, I understand there are three copies—

"A  Yes, there is.

"Q  —and that one copy goes to the person who bought the machine or is buying the machine—

"A  Uh huh.

"Q  And what happens to the other two copies?

"A  One goes to the office, and one goes to Beneficial Finance.

"Q  You do not retain a copy yourself?

"A  No.

"Q  Do you retain any written record?

"A  Of my sales?

"Q  Yes, of your sales; your sales to the people you have sold a machine to?

"A  No, I don't keep any record."

Aside from possible profit from the sale of machines taken in trade, the dealer's only opportunity to profit from his "business" was in selling more machines; his margin of profit was uniform no matter how many machines were sold.

"Q  Does your profit margin increase once you reach a certain level, as far as selling machines is concerned; say after you have sold five or ten or fifteen, do you get a little better deal as far as the cost of them is concerned?

"A  No, I don't.

"Q  It stays the same throughout?

"A  It stays the same."

With respect to repairs on machines which had been sold the testimony was as follows:

"Q  If a machine should become in a state of disrepair, who makes the repair on that machine?

"A  Well, it depends on how serious it is. If it's just minor, I fix it; and if it isn't, Mr. Kirkpatrick does all the repair work.

"Q  Why is that?

"A  Well, he has a little more experience than I have about it."

With respect to the stability of the dealer's "business," plaintiff testified as follows:

"Q Do you find there is quite a turnover of the dealers?

"A Yes; quite a bit.

"Q What is the reason for that?

"A Because everybody hasn't the ability to make a living at it."

The only question on this appeal is whether the foregoing evidence is sufficient to support the Department's decision that the relation of employer-employee existed between the petitioner and the so-called "dealers." The Department argues that the "findings of fact as found by the referee are conclusive and binding upon the court."

■■■■ The mere finding of certain facts, even if accepted as conclusive, is not of itself decisive that the facts so found constitute an employer-employee relationship. As we explained in *Baker v. Cameron*, 240 Or 354, 401 P2d 691 (1965), the question of whether certain facts are sufficient to support an administrative finding that a certain legal relationship exists is a question of law which the court itself must decide.① We now address ourselves to that task.

The pertinent statutes are as follows:

"ORS 657.030. *Employment; generally.* \* \* \* '[E]mployment' means service for an employer \* \* \* performed for remuneration or under any contract of hire, written or oral, express or implied. \* \* \*"

---

① In the *Baker* case the court hastened to add that the question of law "is in some degree dependent upon the general purpose behind the entire principle of unemployment insurance, a subject in which the Commissioner should have some expertise," and in that respect the decision of the administrative agency should be given some consideration.

"ORS 657.040. *Employment; when service for pay excluded.* Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the commissioner that:

"(1) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(2) Such individual customarily is engaged in an independently established business of the same nature as that involved in the contract of service."

■ Our previous cases make it clear that in using the word "employment" in the Unemployment Insurance Act the legislature did not intend to incorporate the common law test for determining the master-servant relationship.[8] Rather, the test is to be found by looking at the purpose of the Act. That purpose is served only if the Act is construed broadly enough to include persons who, although independent contractors according to the common law test, are peculiarly subjected to the hazard of unemployment because of the nature of their occupation.

Illustrative of this interpretation is our most recent case, *Baker v. Cameron, supra.*[9] In that case it seems clear that if an action had been brought against the employer for the negligence of the persons employed by him, he would have been insulated from liability on the ground that the persons employed were independent contractors. Yet the court held that the services

[8] Rahoutis v. Unemployment Comm'n, 171 Or 93, 136 P2d 426 (1943); Singer Sewing Machine Co. v. State U. C. C., 167 Or 142, 103 P2d 708, 116 P2d 744, 138 ALR 1398 (1941).

[9] Unemployment Compensation Com. v. Brown, 225 Or 306, 358 P2d 502 (1960); Unemployment Compensation Com. v. Bates, 217 Or 121, 341 P2d 119 (1959).

performed constituted employment within the meaning of the Act.

■ We look, then, to the facts of the present case for the purpose of analyzing them under the definition set out in ORS 657.030 and 657.040. The facts clearly establish that the dealers were employed by plaintiff to perform services for which they received remuneration. Therefore, plaintiff had the burden prescribed by ORS 657.040 to show that those he employed were free from control or direction over the performance of the services and that they customarily are engaged in an independently established business of the same nature as that involved in the contract of service.

The evidence shows that a considerable amount of direction, if not control, was exercised by plaintiff in connection with the services performed by the dealers. The plaintiff's indoctrination program, the control over the price at which the merchandise could be sold, the allotment of territory for each of the dealers, the arrangement for appointments with customers all indicate a certain amount of direction by the plaintiff in the conduct of the dealer's activities.

■■ Further, it does not appear that the dealers meet the test prescribed in ORS 657.040 (2) that they be customarily "engaged in an independently established business of the same nature as that involved in the contract of service." We understand this part of the statute to mean that to exclude coverage it must be shown that the person engaged to perform services for another does so as an entrepreneur, i.e., where the enterprise calls for the investment of risk capital with the prospect of reaping returns or suffering a loss in the venture, the employment of others, and ordinarily the performance of service for more than one

person. None of these factors are found in the present case.

■ It is to be noted that the statute requires the occupation to be both "independently established" and "customarily" engaged in. This requirement is not met if the continued existence of the enterprise depends upon its relationship with a particular employer.[④] If there is such dependence, the person employed does not have the prospect of supporting himself in the pursuit of his occupation if the person employing him terminates the relationship. It was the purpose of the Unemployment Insurance Act to provide relief where there was this type of risk of unemployment.

■ In the present case the dealer's dependence for his livelihood upon the continued relationship with a single employer, the plaintiff, is manifest. The precariousness of the dealer's continued employment in selling merchandise for plaintiff was established by the plaintiff's own testimony to the effect that there was substantial "turnover" of dealers.

The manner in which the dealer's activities were interwoven with those of the plaintiff makes it evident that there was not the independence of occupation

---

[④] "* * * The typical independent contractor has a separate establishment distinct from the premises of the person for whom the services are performed; he performs services under an agreement to complete a specific 'job' or piece of work for a total remuneration or price agreed on in advance; at times and places and under conditions fixed by him, he offers his services to a public or customers of his own selection rather than a single person; neither he nor the person for whom the services are performed has the right to terminate the contract except for cause; he may delegate the performance of the services to helpers; he performs the services in or under his own name or trade name rather than in or under that of the person for whom the services are performed; the performance of the services supports or affects his own good will rather than that of the person for whom the services are performed; and he has a going business which he may sell to another." 12 Fed. Reg. 7966 (Nov. 27, 1947).

contemplated by the statute. We have already alluded to the direction and control under which the dealers operated—direction and control with respect to price, territory and training. Other aspects of the activities of the dealers and plaintiff were interrelated. As we previously mentioned, plaintiff's office was the head-quarters and clearing house for the dealers, plaintiff did the bookkeeping and accounting for the dealers, the dealers assigned their conditional sales contracts to plaintiff, the advertising program by which appointments could be made for the dealers was carried on by plaintiff, and there were other interconnected activities. Considering all of the foregoing factors in relation to the objectives of the Unemployment Insurance Act, we are of the opinion that plaintiff is engaged in employment within the meaning of the Act.

The decree of the trial court is reversed.