Argued November 22, 1977, remanded for a redetermination of the deficiency January 23, reconsideration denied February 24, petition for review allowed May 23, 1978

REPUBLIC DEVELOPMENT COMPANY, INC.,
*Petitioner,*
*v.*
EMPLOYMENT DIVISION, *Respondent.*
(No. 76T-T-10, CA 8373)
574 P2d 660

Willard E. Fox, Salem, argued the cause and submitted the brief for Petitioner.

W. Benny Won, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Before Schwab, Chief Judge, and Thornton and Joseph, Judges.

JOSEPH, J.

## JOSEPH, J.

Petitioner, a general contractor, seeks judicial review of a referee's order affirming the administrator's determination that payments made for certain services in 1973, 1974, 1975 and 1976 were subject to the unemployment payroll tax.[1] The issue for decision is whether the performance of those services was employment within the meaning of ORS 657.040.[2]

Petitioner's principal business is building so-called "speculation homes." The purported employes are all subcontractors in the building trades. On an annual basis petitioner surveys its market area to determine the going piecework prices for the performance of the various elements included in building houses. It then tenders to interested subcontractors a "Proposal,"

---

[1] The Division concedes that the referee erred in including certain payments in the payroll base for the deficiency assessment which were not remuneration for covered services. That concession will require a redetermination of the deficiency assessment on remand.

[2] "Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the administrator that:

"(1) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

"(2)(a) Such individual customarily is engaged in an independently established business of the same nature as that involved in the contract of service; or

"(b) Such individual holds himself out as a contractor and employs one or more individuals to assist in the actual performance of services and who meets the following criteria shall be deemed to have an independently established business:

"(A) The individual customarily has two or more effective contracts.

"(B) The individual as a normal business practice utilizes separate telephone service, business cards and engages in such commercial advertising as is customary in operating similar businesses.

"(C) The individual is recognized by the Department of Revenue as an employer.

"(D) The individual furnishes substantially all of the equipment, tools and supplies necessary in carrying out his contractual obligations to his clients."

[ 265 ]

which they are free to accept or refuse. If a subcontractor accepts and executes a "Proposal," petitioner furnishes work to be done at the rate established by the survey. Each subcontractor has to give petitioner a one-year warranty on its work. The contract remains in force until a new rate is established. Subcontractors are free to work for other contractors, and some do, or for themselves independently, but the whole point of the method used by petitioner is to assure itself a work force at fixed rates by making available to its subcontractors a reasonably assured amount of work without the need to bid competitively for contracts.[3]

Involved are 13 individuals and partnerships who continuously or at various times during the relevant period performed services for petitioner under the described arrangement. The transcript made before the referee and the briefs are devoted to detailed and lengthy descriptions of the characteristics of each of them in the context of their methods of work, their history and experience, their business practices and their relationships with petitioner. The referee made 173 findings of fact, of which no less than 134 dealt with such details. Most of the 13 could well be described as quintessentially independent contractors, but that gains nothing for an answer to the question of the coverage of the unemployment compensation law. *See Rahoutis v. Unemployment Commission,* 171 Or 93, 136 P2d 426 (1943).

On at least 17 occasions this court has been faced with resolving questions of coverage under ORS 657.040, the most recent of which to contain a detailed discussion was *Revlon Service, Inc. v. Employment Division,* 30 Or App 729, 567 P2d 1072 (1977). A few of those cases appear now to have been wrongly decided (e.g., *Michelet v. Morgan,* 11 Or App 79, 501 P2d 984 (1972)), very doubtful (e.g., *Employment Div. v. Edw.*

---

[3]Petitioner does do some building of individualized homes. Subcontractors on those projects bid competitively for the work. The assessment involved here relates to speculation homes.

*Hines Lbr.,* 19 Or App 866, 529 P2d 934, *rev den* (1975)) or inexplicable (e.g., *Klamath Dental v. Morgan,* 19 Or App 521, 528 P2d 91 (1974)); a few presented situations quite free from any doubt (e.g., *Dick v. Morgan,* 2 Or App 437, 468 P2d 544 (1970); *Petrol Stops Northwest v. Morgan,* 10 Or App 620, 501 P2d 341 (1972)). The others, by and large, presented difficult problems that could only be decided on a case-by-case basis, given the vagueness of the statute and the failure of the courts to have developed clear guidelines. Any attempt at clarification may prove futile.

ORS 657.040 in its present form was enacted in 1967. The legislative history (*see Revlon, supra,* 30 Or App at 734) shows that an effort to provide a set of rules by *replacing* what is now subsection (2)(a) with what is now subsection (2)(b) ended with the *addition* of the latter to the former. Subsection (2)(b) has only been involved directly once in a judicial review (*Edw. Hines Lbr., supra*), but it presumably has performed useful functions in business and the law's administration. In most litigated cases, as here, freedom from control or direction has been conceded (*but see Union Avenue Club v. Peet,* 249 Or 135, 437 P2d 730 (1968) and *Dick, supra*) and, as here, the putative employer has conceded that subsection (2)(b) cannot be satisfied. Subsection (2)(a) has been and remains the problem-creating provision, but as will appear later subsection (2)(b) does have some bearing on the meaning of subsection (2)(a).

On its face and without reference to the cases, the statute puts a heavy burden on one seeking an exemption. "Services performed * * * for remuneration are deemed * * * employment * * * unless it is shown to the *satisfaction of the administrator* that" the conditions of subsections (1) *and* (2)(a) *or* (2)(b) are satisfied. A determination by the administrator that the services were covered employment is prima facie correct (ORS 657.683(4)), and the putative employer

has the burden of proving entitlement to an exemption.

The first element to be shown is that the putative employe "has been and will contine to be *free* from control *or* direction over the performance of * * * services, *both* under his contract *and* in fact." As has been noted, in most of the appealed cases, that "freedom" has been conceded by the administrator, but we observe that the concession is frequently not warranted by the record. In the instant case, it is beyond denial that, whatever the "Proposal" form said, the petitioner did direct when, where, how much and in what way each of the 13 subcontractors performed their work. The same could be said in almost all of the decided cases.

Why, then, does the Division usually concede "control"? The answer is not readily apparent, but it might simply be that, given the double test for exemption, the administrators have, more or less as a tradition, put purported employers to their proof on the second prerequisite for exemption, that is subsections (2)(a) or (2)(b). The former requires a showing that the one performing services "customarily" (i.e., usually, habitually, in the ordinary course of affairs; *see Layman v. State Unemp. Comp. Com.,* 167 Or 379, 117 P2d 974 (1941)) conducts "an independently established business of the same nature as that involved in the contract" with the alleged employer. Again independently of the case law, the statutory words can fairly be read to require that the claimed exempt service be performed by one who usually in the course of his affairs performs the same services for consumers of his product without intervention of the economic activities or interests of others upon which he is dependent to furnish the demand for which he is the supplier.

■ Given the historical setting and objectives that gave rise to the federal and state unemployment compensation benefit systems *(see* Larson and Murray,

*The Development of Unemployment Insurance in the United States,* 8 Vand L Rev 181 (1955)), the "economic realities" tend (in the absence of definitive legislation to the contrary) to compel the conclusion that a service relationship that creates a long or short-term dependency for income on the buyer's need for the service as service (as distinguished from an end product) is employment for the purpose of the unemployment compensation law.

The foregoing reading of the statute does not comport well with all of the Oregon cases involving the construction trades. *Unemployment Comp. Com. v. Bates,* 217 Or 121, 341 P2d 119 (1959), suggested strongly that the alleged employer's burden was to show that the relationship with the performers of service was the same as if he were buying a product. Similarly, in *Culp v. Peet,* 3 Or App 406, 474 P2d 13 (1970), the reasoning is consistent with that suggested here, even though the result is pretty clearly wrong. The same is to be said about *Kuhlman v. Morgan,* 9 Or App 184, 496 P2d 246 (1972). On the other hand *Barger v. Morgan,* 13 Or App 111, 507 P2d 821, *rev den* (1973); relying on *Culp* and *Kuhlman* to some extent but mainly on *Michelet v. Morgan, supra,* excluded a group of subcontrators who would not have been exempted under the suggested reading of the statute. In *Klamath Dental v. Morgan, supra,* which involved a building contractor and his subcontractors hired by a dental corporation to build an office building, we affirmed the denial of exemption for reasons that are opaque. The result was wholly inconsistent with the "service qua service" rationale, for what the "employer" paid for there was a finished product supplied by a producer whose "enterprise" was wholly separate from and independent of that of the employer.

The conclusion to be drawn from the construction trade cases is that they have produced a state of

unpredictability, and they do not constitute a comprehensible body of law.[4] It seems desirable to take a new look at the problem, because we have apparently lost our way somewhere.

The beginning point, *Baker v. Cameron,* 240 Or 354, 401 P2d 691 (1965), which dealt with another aspect of the building trades, is the fountainhead for all of the recent cases. The first thing to note about that case is that the employer there was, with respect to both the salesmen and the applicators, buying a pure service, and the functions of the employes were dependent upon economic interests of that employer and others competing with him. Another clear point is that both the salesmen and the applicators were not by any means solely dependent upon that employer for their livelihood. Finally, both salesmen and applicators enjoyed a high degree of independence insofar as the where, when and how of their performance was concerned, in fact as much as they could possibly want. *See Revlon, supra.*

Although the language usually quoted from *Baker* is a quote from the Willcox article cited in footnote 4, *supra,* the real key to the case is these words:

> "* * * [T]he Commission's records, however, reveal a different picture. They show that a substantial number of these men are not 'customarily' entrepreneurs, 'engaged in an independently established business.' They 'customarily' work for only one, two or three employers. *When work for such employers is not available these men become unemployed."* (Emphasis supplied.) 240 Or at 366.

If one reads the emphasized sentence as referring to only the relationship between "these men" and Baker, it is a false statement, for the record was clear that

---

[4]Nothing in this opinion should be taken to suggest that the cases arising from other situations *have* produced a comprehensible body of law. The same was certainly true as of 1955 throughout the United States. *See* Wilcox, *The Coverage of Unemployment Compensation Laws,* 8 Vand L Rev 245, 264-65 (1955). There is no reason to believe that the situation has got any better since then.

they always could (and at least occasionally did) perform exactly the same service for Baker's competitors. The only sense in which the statement is true is that "these men" were economically dependent for a market for their services on people or firms like Baker who marketed the ultimate product to consumers. They were thus employes.

*Kirkpatrick v. Peet,* 247 Or 204, 428 P2d 405 (1967), with its talk about "entrepreneurs," "risk capital," "employment of others" and the like is seemingly somewhat more definite in its language than *Baker* and also inconsistent with the approach suggested here. But it was decided before subsection (2)(b) was added to the statute covering the factors *Kirkpatrick* dealt with, and for that reason alone, the case should not be regarded as meaningful as we have heretofore regarded it in some of our cases.

Subsection (2)(b) was enacted in 1967 when *Baker* was the latest judicial gloss on ORS 657.040. The legislature must be taken to have realized that the thrust of that case was that if the administrator decided a particular relationship was employment, the taxpayer was faced with a substantially impossible burden to show that he was buying something other than dependent services. As was pointed out in *Revlon, supra* the first legislative reaction was to eliminate subsection (2) entirely, leaving only the control and direction test of subsection (1). Then what is now subsection (2)(b) was proposed to replace former subsection (2), under which *Baker* was decided. Had that been done, there would have been reasonably certain standards for exemption, assuming control or direction existed and that every element had to be satisfied.[5]

The apparent difficulty with that approach which caused it to be abandoned by the legislature was that the substitution of the subsection (2)(b) language for

---

[5] *Compare Mt. Jefferson Carpets v. Emp. Div.,* 25 Or App 375, 378, 548 P2d 1354 (1976) *with Teton Industries v. Emp. Div.,* 26 Or App 725, 730-31, 554 P2d 580 *rev den* (1976).

old subsection (2) would undoubtedly have destroyed existing exemptions recognized by the administrator or the courts. So the legislature retained old subsection (2) as subsection (2)(a) and added subsection (2)(b). In our cases, with the exception of *Revlon, supra,* we have heretofore attached no particular significance to that legislative history, but we now recognize that it is significant to at least this extent: It was the intention of the legislature to create criteria by subsection (1) and (2)(b) which were definitive of eligibility in every instance where they are satisfied; and it was the intention of the legislature to allow the administrator to resolve the remaining problems by a determination whether under the *Baker* rule the alleged employer was hiring services as services or whether he was buying an ultimate product or ultimate service. And, since in *Baker* the Supreme Court analyzed the relationships involved in a manner that was substantially all encompassing of every purchase of services utilized in the preparation of a product for the consumer of that product, the administrator's determination must stand if it was reasoned correctly by the service as service test.

■ The administrator in this case determined that the 13 individuals and partnerships were in covered employment for the purpose of the tax. Because he did reach a conclusion that is consistent with the appropriate test, the referee's order is affirmed.

The Employment Division having conceded that the order was unlawful in substance insofar as certain payments which were not for services were included in the payroll based for assessment, the case must be remanded for a redetermination of the deficiency.

Remanded for a redetermination of the deficiency.