Argued June 24, affirmed August 12, 1974

## ACCIDENT PREVENTION DIVISION, *Respondent, v.* STADELI PUMP AND CONSTRUCTION, INC., *Petitioner.*

525 P2d 170

*R. W. PicKell,* Salem, argued the cause and filed the brief for petitioner.

*Al J. Laue,* Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Lee Johnson, Attorney General, and W. Michael Gillette, Solicitor General, Salem.

Before Schwab, Chief Judge, and Langtry and Thornton, Judges.

THORNTON, J.

This is an administrative appeal which arises out of a Citation and Notice of Proposed Penalty issued by the Accident Prevention Division (APD) of the Workmen's Compensation Board concerning an

alleged violation, by Stadeli Pump and Construction, Inc. (Stadeli), of a provision of the Oregon Safety Code. The code was promulgated pursuant to the provisions of the Oregon Safe Employment Act, ORS 654.071. Among other things the code requires that all trenches over four feet in depth be shored to prevent cave-in accidents.

Stadeli appeals, seeking relief from an order by a referee of the Hearings Division of the Workmen's Compensation Board, affirming the above citation and approving and assessing a penalty of $200 against Stadeli.

The alleged violation was described in the citation as follows:

"There is 1600 feet of trench that is from four (4) to fourteen (14) feet in depth at eleven (11) locations on the job site that is not shored or the sides sloped to the angle of repose."

The issue before this court is whether the order of the APD and the referee is (1) lawful in substance and procedure and (2) supported by "reliable, probative and substantial evidence in the whole record * * *." ORS 183.480 (7).

Stadeli contends that the order of the Hearings Division is invalid for the following reasons:

(1) The hearing officer failed to consider evidence that Stadeli's subcontractor had control and responsibility for carrying out that portion of the project work involving installation of eight-inch lateral pipe, and where part of the violation allegedly occurred; and

(2) There was no evidence that the portion of the project (the main trench) over which Stadeli contends it had exclusive control was an unshored trench

where employes were currently working or where employes would be working at some future time without benefit of shoring in violation of pertinent safety code provisions.

The essential facts are: Stadeli was engaged in installing sewer lines and manholes on a project near Albany, Oregon. The president of Stadeli testified that the firm of "Lord Brothers" was the general contractor on the project; that "Lord Brothers" had subcontracted a portion of the sewer work to Stadeli; and that Stadeli in turn subcontracted a portion of its work to Marvin Ferris. The job involved the installation of a main-line or trunk sewer and a network of lateral lines. The trunk sewer line was 12-inch pipe, 1,900 feet long. The lateral lines were of three smaller sizes: four-inch, six-inch and eight-inch pipe. The work also included the installation of concrete manholes where the lateral lines joined the trunk line.

Stadeli excavated its trenches for the system with a power backhoe. The soil throughout the site was hard-packed clay. The sides of the trench were vertical. All the trenches were approximately 30 inches in width. The main trench varied in depth from 14 feet to 19½ feet. The manhole excavations were 9 feet wide by 10 feet long, and were as deep as the main trench. The lateral trenches were shallower. Stadeli used hand labor in laying all the pipe and in setting, with grout, the concrete manholes.

On August 27, 1973, a field inspector for the APD inspected the site. He was accompanied on his inspection by Marvin Stadeli, who was superintendent on the job. Mr. Stadeli identified the work being done by his firm. Together the two men measured the depths

of the excavation in the various parts of the project. According to the testimony Marvin Stadeli made no mention at this time of the existence of any subcontract.

Stadeli was then in the final stages of the job. All the excavating had been done. The 12-inch pipe in the main line had been laid. The four-inch pipe and the six-inch pipe had been laid. Some, but not all, of the eight-inch pipe had been laid. Portions of the trenches had been backfilled with gravel; other sections were being backfilled on that day. The concrete manholes were still to be installed. The remainder of the main trench could not be backfilled until the manholes were in place, which in turn required the completion of the laying of the eight-inch laterals.

At the time of the inspection on August 27, some 1,600 feet of trench remained, all greater in depth than four feet, which had not been backfilled. There was no shoring in any of the trenches or manhole excavations. No shoring was in evidence at the job site. Shoring had been used earlier, however, during the installation of the 12-inch trunk line. It was moved forward progressively as the 12-inch pipe was laid. The inspector testified that he saw this shoring in use during an earlier inspection on July 27. There was no evidence that shoring had been used in the lateral trenches for the eight-inch pipe, and Marvin Stadeli acknowledged this fact during his testimony at the hearing.

The inspector observed no workmen in the trenches during his inspection. There was, however, hand labor still to be done in the trenches in laying the remainder of the eight-inch laterals, in hooking them up with the concrete manholes and in setting the manholes.

There was testimony that two days previously, on August 25, Marvin Stadeli and his brother had worked in lateral trenches which were not shored, and that at some time immediately prior to August 27 another Stadeli employe had worked in an unshored section, spreading backfilled gravel.

Stadeli makes no contention that "Lord Brothers," the general contractor, has any legal responsibility as to any of the alleged violations involved here.

■ We begin our analysis by noting that the Oregon Safe Employment Act places the burden of providing a safe place of employment on the employer. ORS 654.010.

ORS 654.005 (3) defines "employe" as

"* * * any individual, including a minor whether lawfully or unlawfully employed, who engages to furnish his services for a remuneration, financial or otherwise, subject to the direction and control of an employer, and includes * * * any individual who is provided with workmen's compensation coverage as a subject workman pursuant to ORS chapter 656, whether by operation of law or by election."

ORS 654.005 (4) defines "employer" as

"* * * any person who has one or more employes, or any sole proprietor or member of a partnership who elects workmen's compensation coverage as a subject workman pursuant to ORS 656.128."

We can find nothing in the Act to provide us with any specific indication of legislative intent concerning who is liable for compliance with job safety laws when one employer subcontracts part of a project to a subcontractor. We have found no prior reported court decisions in this state or elsewhere on this pre-

cise question. A few cases from other jurisdictions deal with the liability of a principal contractor for injuries to employes of a subcontractor. But none of such cases was helpful. All turn on the language of special statutory provisions dealing specifically with these relationships, and making express provisions for fixing liability thereunder.

■ In *Harris v. State Ind. Acc. Comm.*, 191 Or 254, 230 P2d 175 (1951), our Supreme Court held that the ultimate test of employer-employe relation for workmen's compensation purposes is not the actual exercise of control but the right to exercise control. Thus if the right of control over the details and manner of performance exists, an employer-employe relationship may exist even though the employer has not actually interfered with the work. *Whitlock v. State Ind. Acc. Com.*, 233 Or 166, 377 P2d 148 (1962); *Oremus v. Ore. Pub. Co./Leibrand,* 11 Or App 444, 503 P2d 722 (1972), Sup Ct *review denied* (1973) (no employer-employe relationship).

■ It would appear from the definitions in our safety Act previously quoted that an employer is responsible only for the safety of working conditions of his own employes.

■ We believe that it would necessarily follow from the definitions in our safety law that if a portion of a job is contracted out to another employer, and the first employer does not control the premises or site, has no direction or control over the work involved, or of the employes of the subcontractor, the first employer would not be liable for safety code violations by the subcontractor occurring on the subcontractor's portion of the job. For reasons which follow, however, we need not decide this question here.

■ In the case at bar the respondent APD had the burden of establishing (1) that a safety code violation occurred, and (2) that Stadeli was the responsible employer of the workmen employed on the project at the points where the alleged violations occurred.

■ As we understand Stadeli's first assignment of error, Stadeli's first defense is that some of the alleged violations occurred on a portion of the job (laterals) which Stadeli had contracted to be carried out by another subcontractor. Contrary to this contention, there was testimony by the inspector that during the August 27 inspection, and in response to the inspector's inquiry, Marvin Stadeli delineated Stadeli's project on the ground, including in his description the lateral trenches. He assisted the inspector in measuring the depths of all the questioned trenches on the job. This would in our opinion constitute a prima facie case that Stadeli was the responsible employer of the workmen employed on the project at the points where the alleged violations occurred.

■ If Stadeli's defense was that a portion of the job in issue was under the control of a subcontractor, and not under Stadeli's control, then Stadeli had the burden of going forward with the evidence that such was the case. It is our conclusion that Stadeli failed to sustain this burden. As the hearing officer observed in his formal opinion and order:

> "* * * If there was a subcontract for the 8-inch-pipe laterals, the written contract would have made clear the relationship of the parties and the scope and degree of Stadeli Pump's control over the subcontractor's work."

The record fails to provide us with proper answers to several questions: Was there in fact a

written agreement between Stadeli and the subcontractor? What, if anything, did the contract provide with reference to direction and control of the work or of the subcontractor's employes, or as to compliance with the Oregon Safe Employment Act?

■■ Stadeli did not offer adequate evidence of any subcontractual arrangement. Instead, for reasons not appearing in the record, Stadeli endeavored to establish by parol evidence that there was in fact such a contract. We conclude that the claimed subcontract was not established by this testimony. Further, there was no evidence that Stadeli had delegated its duty to maintain a safe work site to a subcontractor, even assuming that such delegation is permissible under the Act. We conclude that the hearing officer acted properly in disregarding this oral testimony.

■ Stadeli's second contention is that there was no evidence that the portion of the project (the main trench) over which Stadeli conceded it had control, was an unshored trench where employes were currently working and where employes would be working at some future time without benefit of shoring.

The thrust of Stadeli's argument is that Stadeli had suspended operations at the manholes pending completion of the lateral lines by the subcontractor and that Stadeli fully intended to provide the shoring before hooking in the laterals at the manholes. Both the APD and the hearing officer reached the opposite conclusion.

Having read the entire record we are satisfied that there was substantial evidence from which both the APD and the hearing officer could reasonably conclude that the safety code was being violated on August

27, 1973, in the unshored lateral trenches for the eight-inch line, and in the unshored manhole excavations in the main trench.

■ We agree with the hearing officer that it is not necessary that a state inspector "catch" a workman in an unshored trench in order to prove that "the hazard is one to which employees are exposed" and that the code has been violated. Other evidence may permit an inference that an unshored trench is a place where employes are currently working, although not present at the moment of inspection. Here there was evidence that shortly before the August 27 inspection Marvin Stadeli and his brother had worked in unshored lateral trenches, and that another Stadeli employe had worked in an unshored section, spreading backfilled gravel.

Contrary to Stadeli's contentions, the evidence established that the work on the project was not at a standstill; that there was still manual labor to be done in these trenches; and that there was a continuity of work without shoring which was intended to continue until the manholes were set and all the laterals hooked up. When the inspector returned on August 28 shoring had been placed in the previously unshored manholes.

■ Where the facts found by the administrative agency or official are supported by substantial evidence in the record, they are binding on this court. ORS 183.480 (7). *Ward v. Ore. State Bd. of Nursing,* 266 Or 128, 510 P2d 554 (1973); *Sch. Dist. No. 48 v. Fair Dis. App. Bd.,* 14 Or App 634, 514 P2d 1114 (1973).

Affirmed.

SCHWAB, C. J., specially concurring.

I think it is unnecessary in this case to discuss

the liability under ORS 654.071 of a prime contractor for the errors or omissions of its subcontractor. In the case at bar there was evidence that Stadeli Pump and Construction, Inc., controlled the work in question and that its employes worked in unshored trenches in violation of relevant safety code provisions. The only evidence to the contrary was testimony from an official of Stadeli that it had subcontracted out the work in question. The hearing examiner, after receiving such evidence, stated that he was not going to consider this testimony for the reason that "I think any evidence as to the subcontractor * * * would best be provided by that instrument, which was not offered here." No attempt was thereafter made to offer a written contract or to prove that the contract was oral. All that Stadeli did was recall one of its witnesses, who testified as follows:

"Q   Was it part of your project to * * * install that trench?

"A   No, sir.

"Q   Whose was it?

"A   Marvin Ferris."

Furthermore, in his opinion and order the hearing officer made the following statement, which is supported by evidence in the record:

"Even if this oral evidence [re the alleged subcontract] was not objectionable, however, we were not persuaded that Stadeli Pump was not just as fully responsible for these trenches as all the other ones. The 8-inch-pipe trenches were among those identified by Marvin Stadeli as being part of Stadeli Pump's work when he accompanied Vearrier [the inspector] on the inspection. Apparently, no mention was made of any subcontract at that time."