Argued January 11, reversed April 4, 1951

# HARRIS *v.* STATE INDUSTRIAL ACCIDENT COMMISSION

230 P. 2d 175

*Ray H. Lafky,* Assistant Attorney General, of Salem, argued the cause for appellant. With him on the brief were George Neuner, Attorney General; T. Walter Gillard, Assistant Attorney General; and Roy K. Terry, Assistant Attorney General, of Salem.

*Ben Anderson* argued the cause for respondent. On the brief were Anderson & Franklin, of Portland.

Before BRAND, Chief Justice, and HAY, LUSK, LATOURETTE and WARNER, Justices.

LUSK, J.

Plaintiff, claiming to be an employee of International Woodworkers of America, C. I. O., a voluntary association (hereinafter call International), and as such to be subject to the Workmen's Compensation Act, filed a claim with the defendant, the State Industrial Accident Commission (hereinafter called the Commission), for compensation for injuries arising out of and in the course of his alleged employment. The Commission denied the claim on the ground that there was no evidence of such employment. He appealed to the Circuit Court, where a jury trial resulted in a verdict and judgment in his favor. The Commission has appealed.

The plaintiff at the time in question was the salaried financial secretary and business agent of Local 7-140, a labor union chartered by International. He was also a member of the Northwest Regional Negotiating Committee (hereinafter called the Committee),

elected by and representing the membership of Southwestern Oregon District Council No. 7, an autonomous association composed of four local unions located in the southwestern section of the state of Oregon, each of which is an autonomous association chartered by International. As a member of the Committee he attended at various times negotiations meetings for the purpose of negotiating working agreements with employers. On March 15, 1949, while driving to Portland to attend such a meeting, he sustained personal injuries in an automobile accident. It is for these injuries that he claims compensation in this case.

Under date of January 15, 1945, International filed with the Commission its notice of election to contribute to the Industrial Accident fund and thereby became subject to the Workmen's Compensation Act as an employer engaged in a nonhazardous occupation. See § 102-1716, O.C.L.A. The notice stated that International "gives notice * * * of electing to contribute to the Industrial Accident fund to cover the following occupations: Executive Officers, Executive Administrative Staff, Organizers, Secretarial, Bookkeeping and Clerical Staff" and stated as the "Nature of occupation of business covered by this notice" "International Union engaged in administrative and organizational activities for woodworking industry." The notice is on a printed form furnished by the Commission.

The Commission assigns as error rulings of the Circuit Court denying its motions for a judgment of nonsuit and for a directed verdict, based upon the following grounds: (1) That the plaintiff was not a workman as that term is defined in the Act; (2) that he was an employee of his local Union; (3) that he

was not one of the persons intended to be covered by International in electing to become subject to the Act; and (4) that the plaintiff was "a member of a firm", to-wit, International, and had not made written application to the Commission to become entitled to coverage as a workman.

Since, in our view of the case, there is no substantial evidence to support the claim that the relation of employer and employee existed between plaintiff and International at the time he was injured, it will be necessary to discuss only the first ground of the motions.

The sole witness on the trial was the plaintiff. He testified in substance as follows: Negotiation of contracts with employers is carried on as a function of International and is in no way controlled by the local unions. During the course of his "employment" as one of the persons to carry on negotiations he worked under the direction of International. Directions usually came from the president or vice-president of International. He lived in Reedsport, and on the day he was injured received a wire from the president or vice-president of International instructing him to appear in the International office in Portland at 10:00 the following morning to attend a meeting. He started to Portland in obedience to this wire, and on the way received the injuries for which he seeks compensation. Each time that he had "functions" he waited for orders from International which directed him where to go. Generally there was one representative from each district in Washington, Oregon, California and Idaho engaged in negotiations. The orders directed whom he was to negotiate with, and he had no discretion in accepting or rejecting the proposals made by em-

ployers. The points to be negotiated are determined by a broad conference in January of each year attended by delegates from each local union in Washington, Oregon, California and Idaho and a part of Montana. After propositions and counterpropositions were submitted he had no authority to determine whether or not they should go into effect. International paid him $12.00 a day while engaged in this work and eight cents per mile for traveling expense. The per diem was later increased to $17.00, and from it there were deducted withholding and Social Security taxes. It developed, however, on cross-examination that the only payment that he had received from International was for the day on which he was injured, although he testified that in each of the years 1947 and 1948 he had served as a member of the Committee for a period of twenty or thirty days. He said that there were many occasions when he waived his pay. Neither his local union nor district council had or exercised any power to direct his work of negotiation. This was exclusively a power vested in International. The president of International was usually the chairman of the negotiations meeting and directed the proceedings.

He became a member of the Committee through an election in which every member of the locals in his district was entitled to a vote. He could be removed at a recall election in which the same persons were entitled to participate. The method by which the members of the Committee are selected was devised through a resolution at the Everett convention of International.

There was the following additional evidence: A withholding statement (received over objection) apparently issued by International, showing that it had paid to W. L. Harris, the plaintiff, in 1949 total wages

(before payroll deductions) $34.00 and had withheld therefrom federal income tax in the amount of $4.10; monthly payroll and contribution reports made by International to the Commission, and covering the period beginning October, 1947, and ending June, 1949; a financial report of International for the three months' period ended September 30, 1948, which shows, among other things, that International during that year paid out of its "negotiating funds" the sum of $14.43 for State Industrial Accident insurance. It was explained by the plaintiff in his testimony that the moneys received by International are allocated to various funds—negotiating fund, general fund, strike fund—and that ten per cent of each dollar is set aside for negotiations.

It was conceded by counsel for the plaintiff that International had never paid to the Commission the sum of one cent a day on account of the plaintiff, which it was required to retain from his pay and so remit if plaintiff was one of its employees: § 102-1737, O.C.L.A.

The court admitted in evidence a five-page document entitled "Memorandum", a part of which consists of a resolution adopted by International at its tenth annual convention held in Portland, Oregon, September 10-13, 1946, while the remainder is a statement, partly factual, partly expression of opinion by an officer of International, of the plaintiff's relationship to that organization. This document was offered in evidence by the plaintiff. After having been received without objection, counsel for the respective parties entered into a stipulation, the purport of which was that the opinions therein expressed by International upon the question of whether there was an employer-employee relationship between it and the plaintiff

should be disregarded as having no probative value. While the stipulation is somewhat ambiguous, we are satisfied that that is the correct construction of it because counsel for the plaintiff in his argument to the jury said with reference to this exhibit:

"* * * it is what the International said to the Commission why they should not allow Mr. Harris's claim. A lot of it is a conclusion of the writer, Mr. Carl Wynn [sic], who was in the courtroom here but did not take the witness stand, and I think the Court will instruct you that any opinions contained here of Mr. Wynn's [sic] which would express any opinion on whether or not there is an employer or employee relationship existent, should be disregarded by you because it is not competent evidence and the document is before you on that condition."

The defendant's brief puts the same construction on the stipulation, and that construction has not been questioned by plaintiff in this court.

The Mr. Carl Winn referred to by counsel for the plaintiff was secretary-treasurer of International.

It was further stipulated that the resolution was "the authority upon which the composition and authority of the negotiating committee was authorized by the International."

The record shows that under date of March 21, 1949, the plaintiff executed on a form furnished by the Commission a report of the accident and application for compensation. This he sent to the office of International in Portland for the purpose of having it complete the report by furnishing the answers to certain questions on the form which are designed to be answered by an injured workman's employer. Instead of answering on the form, International prepared

the "Memorandum", attached it to the report, and forwarded both to the Commission. The following is a copy of the entire memorandum:.

"April 1, 1949

MEMORANDUM

TO: State Industrial Accident Commission of Oregon

FROM: International Woodworkers of America, CIO

It is our opinion the claimant, W. L. Harris is not an employee of the International Woodworkers of America, CIO. He is the Financial Secretary and Business Agent of Local Union 7-140, Reedsport, Oregon. In this capacity he is elected by the membership of the Local Union. He receives a regular salary from Local 7-140. Local Union 7-140 is an autonomous association chartered by the International Woodworkers of America.

W. L. Harris in addition to being Financial Secretary and Business Agent of Local Union 7-140 is also a member of the Northwest Regional Negotiating Committee elected by and representing the membership of Southwestern Oregon District Council No. 7.

Southwestern Oregon District Council No. 7 is an autonomous association composed of four Local Unions located in the southwestern section of the state of Oregon, each of which is an autonomous association chartered by the International Woodworkers of America.

As a member of the Northwest Regional Negotiating Committee representing District Council No. 7, W. L. Harris in the company of other members of the Committee, who represent other District Councils, meets with employers, employer representatives and representatives of employer associations for the purpose of negotiating working agreements covering the conditions under which members shall work.

W. L. Harris attends negotiations meetings at the mutual convenience of the employers or their representatives and the members of the Northwest Regional Negotiating Committee.

The International Woodworkers of America by allocation of revenue to its Negotiating Fund pays transportation, per diem expenses and a certain fixed amount for time loss from regular employment to members of the Northwest Regional Negotiating Committee.

The officers of the International Woodworkers of America have no right to direct or control the alleged employee, W. L. Harris as a member of the Northwest Regional Negotiating Committee.

District Council No. 7 as does all other District Councils, elects their member on the Northwest Regional Negotiating Committee. Members of this Committee do the bidding of the District Council which elects them.

W. L. Harris is subject to and required to direction from District Council No. 7.

The following is a Resolution taken from the Proceedings of the Tenth Annual Convention of the International Woodworkers of America, CIO, held in Portland, Oregon on September 10-13, 1946.

"SUBJECT: COMPOSITION AND AUTHORITY OF NEGOTIATING COMMITTEE.

CONVENTION ACTION: Concurrence.

WHEREAS: The Fifth, Eighth, and Ninth Annual Conventions of the International Woodworkers of America established a joint negotiating committee representing the membership in the Northwest, and also outlined procedure and composition of such committee, and

WHEREAS: The various revisions as made at the above named Conventions have materially changed the negotiating program, and these revisions have not been condensed and brought up to date, making the procedure unwieldy and difficult to understand.

THEREFORE BE IT RESOLVED: That the Tenth Annual Convention adopt the following as the contents of the program adopted in the three Conventions with such amendments as made herein to take care of the conditions as they now exist.

(1) We recommend that a committee, consisting of one (1) representative from each district council or provisional council in the Northwest shall be empowered to act in the capacity of Northwest Regional Negotiating Committee.

(2) The Northwest Regional Negotiating Committee shall continue to negotiate for establishment of uniform hours of work, higher wages, improved working conditions, and standardized working agreements. All other matters shall be negotiated on an area or joint area basis and these negotiations shall be coordinated by the Northwest Regional Negotiating Committee, and shall not become a part of the regional negotiations until such a time as the Broad Negotiating Conference determines that they have become regional in scope.

(3) A Broad Negotiating Conference shall be called by the Chairman of the Northwest Regional Negotiating Committee to commence on the second Saturday in January of each year; representation to such conference shall be on the same basis as representation to the International Convention. Such Conference or Special Broad Conferences that may be called shall be governed by the International Constitution.

(4) The Northwest Regional Negotiating Committee shall be empowered to call special conferences and shall set the time and place.

(5) All Local Unions and District Councils shall submit to the Northwest Regional Negotiating Committee no later than the 15th day of November of each year any and all points they

wish to be considered by the negotiating conferences.

(6) No later than the second Saturday in December of each year the Northwest Regional Negotiating Committee shall submit all points as received from the Districts and Local Unions along with their own recommendations back to the Local Unions and District Councils for their discussion and action prior to the conference.

(7) The two senior International Officers present shall be included as part of the Northwest Regional Negotiating Committee with full voice and vote. The International President shall be the chairman of the Northwest Regional Negotiating Committee and in his absence one of the International Vice-Presidents shall act as chairman.

(8) Each District and Provisional Council participating in broad Negotiations shall conduct the referendum vote for the election of its regular and alternate member to the committee in the same manner as now provided for in the International Constitution for electing International Executive Board Members. Members of the Committee shall take office immediately upon certification of their election. Their term of office shall be two (2) years.

(9) A roll call vote shall be established and conducted in the same manner as now provided in the International Constitution for Executive Board Meetings.

(10) The Northwest Regional Negotiating Committee shall consider and act upon only such points of industry negotiations that may be referred to it by International Convention or Delegated Conference and/or any point of industry negotiations that may be proposed by any employer or employer association.

(11) The Northwest Regional Negotiating Committee shall be empowered to submit a referen-

dum strike ballot to the membership involved if and when they deem it necessary.

(12) Any proposed settlement reached by the Northwest Regional Negotiating Committee in negotiations with any employer association shall be submitted by referendum vote to the membership of all Local Unions participating in industry negotiations for their approval or rejection. No vote shall be taken on any proposed settlement until negotiations have been completed with a majority of employer associations with whom the Negotiating Committee has authority to negotiate.

(13) The Northwest Regional Negotiating Committee shall negotiate for all Local Unions and District Councils for whom they have the authority to negotiate those points adopted at the Conference. Each Local Union shall give written authorization to the Negotiating Committee of its desire and that it has opened its contracts on the points for negotiation, otherwise the Local Union will not be represented.

(14) Any authorizations shall include the following: 'It is understood the majority of the votes cast by the membership involved shall constitute acceptance or rejection.'

## INTERNATIONAL WOODWORKERS OF AMERICA

The International Woodworkers of America is not a party to the contract or working agreement which results from the meetings between employers, employer representatives or representatives of employer associations and the Northwest Regional Negotiating Committee.

I am advised that on a trip required by his duties as a representative of District Council No. 7 on the Northwest Regional Negotiating Committee, W. L. Harris was involved in an automobile accident which has resulted in his claim for compensation

from the State Industrial Accident Commission of Oregon.

It is not our intent nor purpose to try to deny W. L. Harris any benefits due from the State Industrial Accident Commission of Oregon. Rather the full resources of the organization will be used to the ends of justice."

A careful examination of the resolution discloses direct and irreconcilable conflict between the "authority" of the Committee and the plaintiff's theory that he was subject to the direction and control of International as a member of the Committee. The resolution created a self-governing body with limited powers and functions, and contained provisions for the procedure to be followed by it in conducting its negotiations and submitting its recommendations to the "membership involved". It provided for election to membership on the Committee, not by International or its officers, but by the district to be represented, which means, as shown in the plaintiff's testimony, by members of the locals in the particular district, all autonomous associations. Such an election was "equivalent to an appointment to the designated employment." *Standard Acc. Ins. Co. v. Hoage,* 66 F. 2d 275. A "roll call vote" was to be established. In general, the resolution—the law of the Committee's being—contemplates that, so far as International or its officers were concerned, the Committee members were free agents, functioning independently and subject to the orders of no one unless it was those who chose them and had the power to recall them. As to this the "Memorandum" sent by International to the Commission says, "Members of this Committee do the bidding of the District Council which elects them." And further, "W. L. Harris attends negotiations meetings

at the mutual convenience of the employers or their representative and the members of the Northwest Regional Negotiating Committee.''

These statements may be considered as evidence coming from the alleged employer in conflict with the plaintiff's testimony, but they accord with the terms of the resolution, for Harris was a ''representative'' of his district council and the Committee of which he was a member was ''empowered to call special conferences and shall set the time and place.'' The plaintiff, it must be assumed, had as much voice in that matter as any other member of the Committee. The two senior International officers present at a conference by virtue of their offices had ''full voice and vote'' on the committee, while the International president, it was provided, should be chairman and, in his absence, one of the International vice-presidents should act as chairman. But any powers which they had and exercised were powers vested in them, not as officers of International, but as officers of the Committee; and there is nothing in the resolution to suggest that, apart from the usual authority of a presiding officer in controlling procedure, they were given any authority to direct or control the plaintiff whether as to his ''voice'', his ''vote'', or in any other respect.

To establish his claim it was necessary for the plaintiff to prove that International was his ''employer'' and he a ''workman'' as those words are defined in § 102-1703, O.C.L.A., which reads:

> ''The term 'employer', used in this act, shall be taken to mean any person, including receiver, administrator, executor or trustee, who shall contract for and secure the right to direct and control the services of any person, and the term 'workman' shall be taken to mean any person who shall engage

to furnish his or her services, subject to the direction and control of an employer."

We said in *Landberg v. S. I. A. C.*, 107 Or. 498, 502, 215 P. 594:

"The relation that must exist to constitute one person an employer and another person a workman, under the compensation act, is the relation of master and servant, and this relation originates wholly in contract, although the contract may be either express or implied. There must be a contract of hire. The services which the servant contracts to perform are personal services, and the master must have the right to direct and control the details of the work and the manner and mode of its performance. The test of the control, which the employer has the right to exercise and to which the servant is subject, means complete control: See Western Indemnity Co. v. Pillsbury, 172 Cal. 807 (159 Pac. 721, 723). In performing the services the servant represents the will of the master and is under his complete control and direction in all of the details of the work and in the mode and manner of its performance."

The foregoing language has been quoted with approval in *Vient v. S. I. A. C.*, 123 Or. 334, 336, 262 P. 250, and *Smith v. S. I. A. C.*, 144 Or. 480, 482, 23 P. 2d 904, 25 P. 2d 1119. See, also, *Bowser v. S. I. A. C.*, 182 Or. 42, 47, 185 P. 2d 891.

■ The ultimate test of the employer-employees relation "is not the actual exercise of control, but the right to exercise control—not the actual interference by the employer with the manner and method of accomplishing the result, but the right to interfere." *Becker v. I. A. C.*, 212 Cal. 526, 531, 298 P. 979, quoted with approval in *Brothers v. S. I. A. C.*, 139 Or. 658, 664, 12 P. 2d 302, and *Bowser v. S. I. A. C.*, supra, 182 Or. 50.

See, also, *Journal Publishing Co. v. S. U. C. C.,* 175 Or. 627, 663, 155 P. 2d 570; *Streby v. S. I. A. C.,* 107 Or. 314, 329, 215 P. 586; *Anderson v. S. I. A. C.,* 107 Or. 304, 312, 215 P. 582; 1 Labatt, Master & Servant (2d ed.) § 18; 71 C. J., Workmen's Compensation, 423, § 165 (b).

In this case, if it can be said that there is evidence that the legal entity, International (see *Standard Acc. Ins. Co. v. Hoage,* supra), rather than its officers, acting in their capacity as members and officers of the Committee, undertook to interfere with the conduct of the plaintiff in the discharge of his duties as a member of the Committee and to "order" him when and where to go and how to perform his duties, such evidence is of no significance if in fact International did not have the right of control which it thus assumed to exercise.

That it did not have such right is shown, not only by the terms of the resolution but by the fact that International had no power to discharge the plaintiff. That right was committed to his district council. The possession of such right, or the want of it, is considered of such high importance in determining whether the employer-employee relation is established that some courts hold that the relation does not exist unless it includes the right to discharge. *Densby v. Bartlett,* 318 Ill. 616, 149 N.E. 591, 42 A.L.R. 1406. This court has not gone so far, though we have said that in determining whether the right of control exists "no single fact is more conclusive * * * than the unrestricted right of the employer to end the particular service whenever he chooses, without regard to the final result of the work itself". *Journal Publishing Co. v. S. U. C. C.,* supra, 175 Or. 663. Mr. Labatt, reflecting

the views of most of the courts, says that it is not a conclusive test, but he adds:

> "On the other hand, although it is perhaps possible to form a theoretic conception of cases in which the relation of master and servant would be predicable between two persons, in spite of the fact that the power of dismissal was not vested in the master, it is apparent that the situation thus supposed is so entirely incompatible with the due exercise of that authority and control which is the very essence of the relation, that such cases are very unlikely to occur in practice. Ordinarily, therefore, the nonexistence of the relation of master and servant will be inferred whenever it appears that the alleged master had no power to dismiss the alleged servant." 1 Labatt's Master & Servant (2d ed.) 67, § 21.

See, also, note to *Hardy v. Shedden Co.*, 78 Fed. 610, 37 L. R. A. 33, 40; 35 Am. Jur., Master and Servant, 446, § 3.

It is said in plaintiff's brief:

> "The composition of the so-called negotiating committee was wholly a function of the International. The International had the power to designate the manner of selecting the person to carry on negotiations in its behalf, and having composed such a committee, obviously had equal power to discharge such committee since an organization's power to create must also imply the power to dissolve."

We may assume that International, having by resolution at its annual convention provided for the organization and functioning of the Committee, could in similar manner have decreed its dissolution. But we are not concerned with such a remote contingency nor with the existence of such an overriding power. The determinative question here is who had the right to

discharge the plaintiff as long as the Committee endured, and there can be no doubt that this right was lodged in the members of the district council.

As shown by the "Memorandum", and testified to by plaintiff, International paid the members of the Committee by allocation of revenue to its negotiating fund "transportation, per diem expenses and a certain fixed amount for time lost from regular employment." The plaintiff was so paid but once, and that was for the day on which he was injured.

■ The payment of wages is considered the least conclusive of the tests for determining whether the relation of employer and employee exists. It is not decisive where it is shown that the employee was actually under the control of another person during the progress of the work. *Arnett v. Hayes Wheel Co.*, 201 Mich. 67, 166 N. W. 957; *Independence Indemnity Co. v. I. A. C.*, 203 Cal. 51, 58, 262 P. 757; *Klemmens v. Workmen's Compensation Bureau*, 54 N. D. 496, 500, 209 N.W. 972. See 35 Am. Jur., Master and Servant, 446, § 3. It is said in 1 Labatt's Master & Servant (2d ed.) 60, § 19:

> "One person may stand in the relation of master to another, although the former does not compensate the latter for his services. But the fact that the person who performed the work in question was or was not paid for his labor by another person tends more or less strongly to prove that the latter was or was not the master of the former. Elements of a less ambiguous quality, however, are commonly supplied by the testimony in cases of the type here under consideration; and it will be found that the payment of wages by one person or by another has usually been viewed either as a merely corroborative circumstance or as a circumstance to be disregarded, supposing the remainder of the testimony to point to a conclusion different from that indicated by it."

In the note to *Hardy v. Shedden Co.*, supra, 37 L. R. A. 39, the author says:

"Of the tests mentioned in the cases last cited the fact that the servant's compensation was paid by the person alleged to be his master is the least conclusive, as will be apparent from the following decisions, which show how completely it is disregarded in cases of various types".

Many decisions are cited in support of this statement.

The principle to be deduced from the authorities is that, when the remaining evidence shows beyond dispute that the alleged employee is subject to the control and direction of one person, evidence that his wages were paid by another should be disregarded. That, we think, is precisely the state of this case.

Neither the pay roll and contribution reports made to the Commission by International nor its financial report gives any aid whatever to the plaintiff's case. The pay roll and contribution reports do not disclose that the plaintiff was one of the persons on account of whom contributions were made by International to the Workmen's Compensation Fund. The classes of employees listed in the application for coverage under the Act made by International do not include the plaintiff, and, as already stated, it was conceded by plaintiff's counsel on the trial that the cent a day which International would have been required to retain from plaintiff's wages and remit to the Commission, had he been International's employee, was never so retained and remitted. The financial report merely shows that during the period covered by it International disbursed out of its negotiating fund the sum of $14.43 for "State Industrial Accident Insurance." It does not definitely show that the disbursement was made to the Oregon

fund instead of to a similar fund in one of the other states in which International carries on its activities. Assuming, however, that it was the Oregon fund, the entry falls far short of being evidence that the disbursement was made on account of the plaintiff or of any other member of the negotiating committee. It could just as well be assumed that this was a payment on account of employees of International such as secretaries, stenographers and the like, who may have been assigned to perform services in conjunction with the meetings of the Committee.

■ But, even though the documents referred to could be interpreted as evidence that International had made a contribution to the Industrial Accident fund on account of the plaintiff, this could avail him nothing because, as stated by Mr. Chief Justice RAND in *Smith v. S. I. A. C.,* supra, 144 Or. 483:

"* * * There is no provision in the act under which plaintiff, under the circumstances stated, could become entitled to compensation. The fund created under the act, from its very nature as well as by express statutory direction, is a trust fund which can be paid out only in conformity with the provisions of the Act. The officers administering the fund are public officers of this state and those who deal with officers of the state are bound to know the extent of their authority. The state cannot be estopped by the unauthorized acts of its officers."

■ It is apparent that at the time International applied for coverage under the Act and at the time it declined to fill out the plaintiff's application for compensation, but instead sent its "Memorandum" to the Commission, it did not consider the plaintiff its employee. It could be argued, on the other hand, that,

when International deducted from the payment of $34.00 to the plaintiff the sum of $4.10 as federal income tax withheld and issued to the plaintiff a withholding statement, it considered that he was in its employ, at least so far as the provisions of the federal income tax law are concerned. But, regardless of International's varying opinions on that subject, the evidence, to our mind, demonstrates conclusively that he was not a workman in the employ of International within the definition of employer and workman in the Act. The jury could not have drawn a contrary inference without ignoring uncontradicted evidence which showed where the right of control over the plaintiff in the performance of his work lay, and that, if the plaintiff was in the employ of any one, it was those who chose him to represent them and had the power to discharge him.

The court erred in denying the motion for a directed verdict.

The judgment will be reversed with directions to enter judgment for the defendant.