Argued and submitted October 20, 2011, reversed and remanded
February 29, 2012

**AVANTI PRESS, INC.,**
*Petitioner,*

*v.*

**EMPLOYMENT DEPARTMENT TAX SECTION,**
*Respondent.*

Office of Administrative Hearings
T71158; A147000

274 P3d 190

Dennis S. Reese argued the cause for petitioner. With him on the briefs was Garrett Hemann Robertson P.C.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Petitioner Avanti Press, Inc., seeks review of a final order of an administrative law judge (ALJ) that affirmed the Employment Department's notice of tax assessment issued to Avanti. The ALJ determined that Avanti, a greeting card company, had employed a sales representative, Andrea Waiau, and that Avanti's compensation to Waiau was therefore subject to unemployment tax, which Avanti had not paid. In its petition for review of that order, Avanti contends, as it did before the ALJ, that Waiau was an independent contractor, not an employee, and that her compensation therefore was not subject to unemployment tax. We reverse and remand.

## I. FACTS

We describe the facts consistently with the ALJ's findings, which are not challenged on judicial review. *McDowell v. Employment Dept.*, 348 Or 605, 608, 236 P3d 722 (2010) (where agency's findings are not challenged, those are the facts for purposes of judicial review). We begin with Waiau's contract with Avanti.

Waiau was an employee of One Coast, a company that represented various businesses, including Avanti. In early 2009, One Coast dissolved. Thereafter, Waiau, who had nearly 30 years of experience as a product sales representative (primarily in the greeting card and gift industries), entered into a written agreement with Avanti to sell the company's greeting cards, journals, and calendars. That "Services Agreement," as summarized by the ALJ, provided:

"A. Waiau would be Avanti's exclusive sales representative for retail outlets in southwestern Oregon. Certain retail outlets in the territory would be considered 'Avanti Customers' for which Avanti would pay Waiau no commission on any sales to those outlets. If Waiau made no sales to other outlets for three months or more, Avanti had the discretion to designate those outlets as Avanti Customers. Avanti reserved to itself all sales to consumers and the right to sell within Waiau's territory through 'other methods or ways.'

"B. Waiau would personally visit Avanti customers at their retail outlets at least once every 12 weeks. Waiau

would solicit orders in accordance with the Services Agreement and Avanti's 'policies, catalogs, supplements, and price information furnished to [Waiau] by Avanti from time to time.' Avanti could furnish Waiau order forms, price lists, catalogs, and other promotional materials for her use.

"C.    Waiau had no authority to accept any order or bind Avanti to any sales. Avanti could 'for any reason or for no reason * * * accept or reject any order or modify any accepted order [and] compromise or adjust the price of its products.' Waiau had no authority to accept orders or receive payments on Avanti's behalf or to make any representations that were inconsistent with the Services Agreement and Avanti's written materials.

"D.    Avanti reserved the right 'with or without prior notice to [Waiau] to establish and change prices, products, ways, methods, or terms of payment or shipment, and any other conditions or terms of sale * * *.'

"E.    Avanti would pay Waiau a percentage of the product invoice price less cash discounts, taxes, shipping, insurance, and other deductions. For sales made within Waiau's territory but shipped outside her territory, Avanti would divide the sales commission between Waiau and the sales representative in whose territory the sale was shipped. Avanti would resolve any disputes regarding this division and its decision would be binding on all parties.

"F.    Avanti would pay Waiau's commissions regardless of whether Avanti collected the sales price on orders she obtained. But if Avanti's overall collections were 'in its sole judgment, particularly slow,' Avanti could extend the time to pay Waiau until 'after Avanti receives payment from its customer.' Avanti also had the right to charge Waiau for customer deductions, returned products, and Avanti settlements with late-paying customers.

"G.    Waiau had the authority to hire, fire, and train her own sales associates. Waiau would pay all employee taxes and all her own expenses.

"H.    The agreement would automatically renew for one-year terms, unless earlier terminated by 30 days written notice from either party. Upon termination, Waiau would return to Avanti 'all materials pertaining to Avanti' and discontinue use of its trademarks, tradename, and other identifying materials.

"I.   Avanti would not be liable to Waiau for any delay in shipment, failure to deliver, 'or any nonperformance of [the Services] Agreement directly or indirectly resulting from or contributed to' by anything beyond Avanti's reasonable control."

(Record citations omitted.)

Because Waiau had previously represented Avanti for years at One Coast, she was already familiar with the company's products. Therefore, Avanti conducted only a half-hour telephone training session with Waiau, and then another half-hour follow-up with her regarding management of special accounts. The company provided Waiau with a manual in connection with her training, as well as promotional materials for Waiau to use at her discretion.

Product prices and sales targets were set by Avanti, and the company informed Waiau of the monthly, quarterly, or yearly sales goals for her territory. An Avanti area manager supervised Waiau's territory and kept track of her sales results; Waiau communicated monthly with the sales manager by fax regarding her orders.

During the relevant time, Waiau maintained a home office with a desk, chair, fax machine, scanner, printer, telephone, computer, travel case, and sample bags. She used the office equipment almost exclusively for business and deducted home office expenses on her personal income tax return. She also used her personal vehicle for business travel. Avanti did not reimburse Waiau for postage, travel, meals, or lodging expenses.

Waiau set her own work schedule and decided how frequently to visit customers. Her commissions were based entirely on her sales, and not on the number of hours that she worked. Between March 16, 2009 and September 15, 2009— the period for which the Employment Department assessed unemployment taxes—Waiau did not represent any businesses other than Avanti and received all of her income from Avanti. She had not registered a business name, she did not carry liability insurance or performance bonds, and she did

not advertise or market her services as a product sales representative. During that period, she passed out business cards that stated, "Andrea Waiau, Avanti Greeting Cards."

The Services Agreement, however, did not prohibit Waiau from representing other manufacturers as well. Beginning sometime after November 12, 2009, Waiau also became a sales representative for two other manufacturers, Borealis Press and Wellspring Gift.[1] Her business cards subsequently reflected that she represented all three companies.

Sometime along the way, Waiau sought unemployment insurance benefits. The Employment Department investigated her claim because she reported no wages from Avanti during 2009. After completing its investigation, the department determined that Waiau was, in fact, an employee of Avanti, thereby making Avanti "an employer subject to the Oregon Employment Department Law."[2] The department assessed Avanti an employment tax of $540.26 based on wages that Avanti had paid to Waiau. *See* ORS 657.505(2) (Oregon employers must pay unemployment insurance taxes into the Unemployment Compensation Trust Fund "on all wages paid for services").

## II.   THE ALJ'S FINAL ORDER

Avanti requested a hearing on the tax assessment notice, and the matter was referred to the Office of Administrative Hearings, which assigned an ALJ to preside over the hearing. At the hearing, Avanti did not dispute that Waiau had performed services for remuneration from Avanti. The issue, rather, was whether Waiau was an independent contractor rather than an employee. *See* ORS 657.040(1) ("Services performed by an individual for remuneration are deemed to be employment subject to this chapter *unless and until it is*

---

[1] On November 12, 2009, Waiau was interviewed by a compliance specialist for the Employment Department. It was sometime after that date that Waiau began representing Borealis Press and Wellspring Gift.

[2] The Employment Department Law applies to "employers," which are defined in terms of "employing units." ORS 657.025. "Employing unit," in turn, includes a company that "has or had in its employ one or more individuals performing services for it within this state." ORS 657.020(1)(a). Consequently, Waiau's status as an "employee" determines whether Avanti is an employer subject to Oregon's unemployment insurance laws.

*shown to the satisfaction of the Director of the Employment Department that the individual is an independent contractor, as that term is defined in ORS 670.600."* (Emphasis added.)).

For purposes of ORS chapter 657 (unemployment insurance), "independent contractor" means a person "who provides services for remuneration and who, in the provision of the services":

"(a)   Is free from direction and control over the means and manner of providing the services, subject only to the right of the person for whom the services are provided to specify the desired results;

"(b)   * * * [I]s customarily engaged in an independently established business;

"(c)   Is licensed under ORS chapter 671 or 701 if the person provides services for which a license is required under ORS chapter 671 or 701; and

"(d)   Is responsible for obtaining other licenses or certificates necessary to provide the services."

ORS 670.600(2). The statutory criteria are conjunctive; a person is not considered an "independent contractor" unless each is met. Under ORS 657.683(4), the employer challenging an assessment has the burden to establish the relevant criteria.

The ALJ determined that, under the facts recounted above, Avanti had not demonstrated that Waiau was an independent contractor within the meaning of that statute. The ALJ concluded that, although Waiau was "customarily engaged in an independently established business" for purposes of paragraph 2(b), she was not "free from direction and control over the means and manner of providing the services," as required by paragraph 2(a), the only other relevant criterion Avanti needed to establish. The ALJ reasoned as follows:

"Although Waiau used her personal vehicle and her own office equipment in contacting customers, Avanti directed and controlled the other means by which Waiau performed her services. Avanti provides its 'trademarks and trade[ ]name and other identifying materials,' and required that Waiau discontinue using them when the

Services Agreement terminated. The agreement required Waiau to solicit orders according to Avanti's policies, catalogs, supplements, and price information and stated that Avanti would furnish order forms, price lists, catalogs, and other promotional materials for her use. Avanti also sent Waiau a manual in connection with her training.

"* * * * *

"Under the Services Agreement, Avanti had the right to control the prices, products, ways, methods, terms of payment or shipment, and 'any other conditions or terms of sale.' Avanti reserved the right to change any of these things without notice to Waiau. It could 'for any reason or for no reason' accept or reject any order or cancel or modify any accepted order and compromise or adjust the price of its products.

"Even the payment of Waiau's commissions was subject to Avanti's control. The Services Agreement provided that if Avanti's overall collections were 'in its sole judgment, particularly slow,' Avanti could wait to pay her until after Avanti received payment from its customer. Avanti also had the right to charge Waiau for unspecified customer deductions, returned products, and Avanti settlements with late-paying customers. Further, Avanti could resolve any disputes regarding the division of her commissions on products delivered out of her territory, and Avanti's decision would be binding on Waiau."

## III. ANALYSIS

On judicial review, Avanti argues that the ALJ misinterpreted the "direction and control" requirement of ORS 670.600(2)(a) and misapplied the applicable administrative rule, OAR 471-031-0181(3)(a), which interprets ORS 670.600(2)(a). That rule provides:

"(3)   Direction and Control Test.

"(a)   ORS 670.600 states that an 'independent contractor' must be 'free from direction and control over the means and manner' of providing services to others. The agencies that have adopted this rule will use the following definitions in their interpretation and application of the 'direction and control' test:

"(A) 'Means' are resources used or needed in performing services. To be free from direction and control over the means of providing services an independent contractor must determine which resources to use in order to perform the work, and how to use those resources. *Depending upon the nature of the business*, examples of the 'means' used in performing services include such things as tools or equipment, labor, devices, plans, materials, licenses, property, work location, and assets, among other things.

"(B) 'Manner' is the method by which services are performed. To be free from direction and control over the manner of providing services an independent contractor must determine how to perform the work. *Depending upon the nature of the business*, examples of the 'manner' by which services are performed include such things as work schedules, and work processes and procedures, among other things.

"(C) 'Free from direction and control' means that the independent contractor is free from the right of another person to control the means or manner by which the independent contractor provides services. If the person for whom services are provided has the right to control the means or manner of providing the services, it does not matter whether that person actually exercises the right of control."

OAR 471-031-0181(3)(a) (emphases added).

According to Avanti, the ALJ failed to take into account the nature of the business involved and the services performed, and, consequently, established an impossibly high threshold by which no sales representative could ever qualify as an independent contractor. The department, in response, defends the ALJ's reasoning and submits that

"[t]here is nothing absurd about the conclusion that a person who promotes an employer's products, at prices and terms dictated by the employer, in a territory dictated by an employer, subject to the employer's right to change the product prices, products available, the available methods of payment, available methods of shipment, and 'any other condition or terms of sale' is an employee."

The department contends that Waiau was not free from Avanti's "direction and control over the means and manner"

of providing services, as those terms are used in the statute and in the rule.

We review the ALJ's interpretation of the independent contractor definition in ORS 670.600(2)(a) and the related terms in OAR 471-031-0181(3)(a) for errors of law. ORS 657.684 ("Judicial review of decisions under ORS 657.683 shall be as provided for review of orders in contested cases in ORS chapter 183 * * *."); ORS 183.482(8)(a); *accord Baker v. Cameron*, 240 Or 354, 359, 401 P2d 691 (1965) ("[T]his court has a consistent line of precedents holding that if the facts are not disputed, the question of whether one is an 'employee' or the contractor of another is a question of law."). Because the parties' dispute centers around the application of the "direction and control" requirement, we begin by reviewing the development of the statutory requirement.

A. *Derivation of the "direction and control" statutory requirement from the "right to control" test*

Since their inception in the 1930s, Oregon's unemployment compensation laws have, in one form or another, included something analogous to the current "independent contractor" exception.[3] Although parts were added over the years, those laws included the following language until 1987:

"Services performed by an individual for remuneration are deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the assistant director that:

"(1) Such individual has *been and will continue to be free from control or direction over the performance of such services, both under a contract of service and in fact*; and

"(2)(a) Such individual customarily is engaged in an independently established business of the same nature as that involved in the contract of service * * *."

---

[3] *See* Or Laws 1937, ch 398, § 2(f)(E) ("Services performed by an individual for remuneration shall be deemed to be employment subject to this act unless and until it is shown to the satisfaction of the commission that: (1) Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and (2) Such individual customarily is engaged in an independently established business of the same nature as that involved in the contract of service.").

ORS 657.040 (1987), *amended by* Or Laws 1989, ch 762, § 6 (emphasis added).

Similar exemptions or definitions relating to independent contractors were scattered throughout other Oregon statutory schemes, including workers' compensation laws, tax laws, and construction contractor laws. In 1989, the legislature decided to create a singular "independent contractor" definition that would apply to those various statutory schemes, including unemployment compensation laws. *See S-W Floor Cover Shop v. Natl. Council on Comp. Ins.*, 318 Or 614, 872 P2d 1 (1994) (describing origin of "independent contractor" definition in ORS 670.600). The new definition, now codified at ORS 670.600, includes the requirement at issue here: that the person be "free from direction and control over the means and manner of providing the services"—otherwise known as the "direction and control" test.

In *S-W Floor Cover Shop*, the court explained that the legislature did not craft the "direction and control" test out of whole cloth for purposes of the independent contractor definition. Rather, the history of the statute, the court held, made clear that the "direction and control" test in ORS 670.600(2)(a) was intended to codify the "right to control" case law that had developed over the years—particularly, in workers' compensation cases. 318 Or at 630 (legislative history of ORS 670.600(2)(a) makes "it clear that the committee [that drafted the "direction and control" language] * * * intended the case law interpreting that phrase as used in ORS 656.005(28) to apply to that phrase as used in the independent contractor definition found in ORS 670.600").

That "right to control" case law, the court explained, analyzed a number of factors in determining whether an employment relationship existed:

> "The test for determining 'control' in the workers' compensation context 'is based not on the actual exercise of control by the employer, but on the right to control.' *Great American Ins. v. General Ins.*, 257 Or 62, 66, 475 P2d 415 (1970) (citing cases). Factors considered by the courts in determining whether a 'right to control' establishes an employment relationship have included, for example: whether the employer retains the right to control the details of the method of performance, *id.* at 68; the extent of

the employer's control over work schedules, *Woody v. Waibel*, [276 Or 189, 192 n 2, 554 P2d 492 (1976)]; and whether the employer has power to discharge the person without liability for breach of contract, *Harris v. State Ind. Acc. Comm.*, 191 Or 254, 269, 230 P2d 175 (1951). Payment of wages is also a factor, *see Whitlock v. State Ind. Acc. Com.*, 233 Or 166, 170, 377 P2d 148 (1962), although it is not considered decisive 'where it is shown that the employee was actually under the control of another person during the progress of the work.' *Harris v. State Ind. Acc. Comm.*, *supra*, 191 Or at 271 (citing cases)."

*S-W Floor Cover Shop*, 318 Or at 622 (footnote omitted).

As those multiple factors suggest, the "[r]ight to control is a matter of degree." *Pam's Carpet Service v. Employment Div.*, 46 Or App 675, 681, 613 P2d 52 (1980). "Even in the purest of independent contractor situations—say, services rendered by an attorney, doctor or accountant—the client could give some instructions about where the services were to be performed." *Id.* In other words, the right to control test, which the legislature codified in ORS 670.600, has never required that an "independent contractor" be free from *all* direction and control. Rather, the question is whether the party contracting for services maintains control over the "means and manner" of performance or, instead, gives more generalized instructions concomitant to the "right of the person for whom the services are provided to specify the *desired results*," ORS 670.600(2)(a) (emphasis added). *See Ponderosa Inn, Inc. v. Emp. Div.*, 63 Or App 183, 190, 663 P2d 1291, *rev den*, 296 Or 120 (1983) (fact that a petitioner could have told a hired painter how to do the work he undertook, including what and where to paint, was "not the kind of ability to control that the statute refers to": "Obviously a contract will specify what is to be painted and, even if impliedly, will ordinarily require that the work be done in an acceptable manner. That does not necessarily mean that there is an employment relationship.").

B.  *The jointly adopted administrative rule*

In 2007, the department, along with the Landscape Contractors Board, the Department of Revenue, the Department of Consumer and Business Services, and the Construction Contractors Board, adopted OAR 471-031-0181, the

governing rule implementing ORS 670.600. *See* ORS 670.605(1) (requiring that the agencies "jointly shall adopt rules to carry out the provisions of ORS 670.600"); OAR 471-031-0181(1) (reciting purpose of the rule). The legislature intended that the agencies would "cooperate as necessary in their compliance and enforcement activities to ensure among the agencies the consistent interpretation and application of ORS 670.600." ORS 670.605(2); *accord Kaib's Roving R.Ph. Agency v. Employment Dept.*, 161 Or App 290, 295, 984 P2d 886 (1999) ("the legislature, when enacting ORS 670.600, intended that there be uniformity and consistency among the enumerated agencies when determining independent contractor status").

C. *Preexisting case law regarding sales representatives*

By the time the legislature codified the "right to control" test in ORS 670.600(2)(a), courts had applied that test to sales representatives on a number of occasions. *See, e.g., Herff Jones Co. v. Tax Com.*, 247 Or 404, 430 P2d 998 (1967) (considering whether the plaintiff, a foreign corporation, had the "right to control" its Oregon sales representatives when determining whether they were independent contractors or employees for corporate income tax purposes); *Kirkpatrick v. Peet*, 247 Or 204, 428 P2d 405 (1967) (door-to-door vacuum salespersons); *Jenkins v. AAA Heating*, 245 Or 382, 386-87, 421 P2d 971 (1966) (door-to-door furnace-cleaning sales representatives); *Castle Homes, Inc. v. Whaite*, 95 Or App 269, 769 P2d 215 (1989) (mobile home sales representatives); *Henn v. SAIF*, 60 Or App 587, 654 P2d 1129 (1982), *rev den*, 294 Or 536 (1983) (magazine sales representatives).

No reported case has involved the application of OAR 471-031-0181 before now. Avanti, however, argues that *Henn*, which involved magazine sales representatives, is persuasive authority for its view of the proper application of ORS 670.600(2) and OAR 471-031-0181(3)(a) in this case. Because the case is illustrative of how the legislature that enacted ORS 670.600 and the agencies that adopted OAR 471-031-0181 would have understood the "direction and control" test to operate in the context of sales representatives, we describe *Henn* in some detail.[4] In *Henn*, a workers'

---

[4] In its response brief, the Employment Department obliquely suggests that the administrative rule might have some meaning apart from the judicial "right to

compensation case, we discussed at length the factors bearing on whether a magazine sales representative was an "independent contractor" rather than an employee for purposes of ORS 656.005(28). We explained that the "principal factors showing right of control are: (1) direct evidence of the right to or the exercise of control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire." *Id.* at 591.

On the facts before us, we concluded on *de novo* review that claimant, a magazine salesperson, was an independent contractor rather than an employee. We described the agreement between the claimant and the putative employer as follows:

> "In January, 1980, [claimant] answered a classified ad in a newspaper for a job as a sales representative for the company. She went to work as an 'authorized representative' of the company, selling subscriptions. She allegedly suffered tendonitis following a fall that occurred while she was making her rounds as a salesperson.

> "A company 'Representatives' Agreement' signed by claimant provides that, as an 'authorized representative' of the company, she agreed to comply with a company policy prohibiting various types of false, misleading and deceptive representations in her sales work and had to account for materials provided by the company and to fill out and properly process subscription forms. She was required to forward to the company any down payments received from subscribers. The agreement further provided that she had to abide by all applicable laws and that authorization to represent the company could be withdrawn for violation of any of the requirements of the agreement. Finally, the agreement provided:

>> " 'I recognize that, as an independent contractor, I am self-employed, that Federal, State and local taxes are not deducted from my commissions and that I may, if I wish, engage in other remunerative endeavors

---

control" test, but it advances no argument in that regard; in light of the holding in *S-W Floor Cover Shop* that ORS 670.600(2)(a) was intended to codify the judicial "right to control" test, 318 Or at 630, we cannot ourselves discern what that other meaning might be.

without jeopardizing my authorization to represent Parents Home Service Institute, Inc.' "

60 Or App at 589.

The company encouraged, but did not require, representatives to work eight hours a day: "No particular hours were specified. Claimant worked for four to five hours on some days and about eight hours on other days. She was not penalized for working less than eight hours a day." *Id.* The company provided a three-day training session in sales technique that was designed to minimize the possibility of representatives misinforming customers. *Id.* at 589-90. The claimant was paid on a modified commission basis, received a mileage allowance of about $30, and received no other benefits.

It was the claimant's job to visit homes and to offer a simple gift (a growth chart) if the resident would allow her to make a sales presentation. As part of the sales presentation, the claimant would offer the prospective customer a "free" copy of *Mothers' Home Encyclopedia* if the prospect agreed to subscribe to *Parents' Magazine.* As part of the sales effort, the claimant showed the prospect a notebook filled with pages taken from previous issues of the magazine; the company provided charts, encyclopedias, and subscription contract forms. *Id.* at 590-91.

The claimant also worked with an area representative who visited the claimant to replenish her supplies and also occasionally provided her with leads to potential customers. The claimant "was supposed to telephone a person at the company offices every day in order to report her sales results." *Id.* at 591. Moreover, "[c]onsistent with the authorization agreement, representatives were allowed to engage in other work and could represent other companies during their sales rounds." *Id.* The claimant was also "allowed to sell wherever she wished and to whomever she wished," and used her own automobile in her representative work. *Id.*

We held, on those facts, that the claimant was free from the direction and control of the company. Tracing through the "principal factors," we began by explaining that "[d]irect evidence of control is slight": the claimant set her

own schedule, she was free to use her own sales technique as long as her representations were not "false, misleading, or deceptive," she could choose the sales areas she covered and the customers she solicited, and the parties' agreement itself stated that she was an independent contractor. *Id.* at 591-92. We then considered the method of payment:

> "Claimant was being paid on commission. When payment is by quantity or percentage, the method of payment test largely becomes neutral. To the extent that it indicates continuing service, it suggests employment; to the extent that it lessens an employer's interest in the details of how the employe[e] spends her time, it has been said to suggest an independent contractor relationship. 1C Larson, Workmen's Compensation Law § 44.33(b). *It has generally been held that a commission salesman who works on a part-time basis, selling only when he feels like it or when the opportunity presents itself, is an independent contractor.* 1C Larson, Workmen's Compensation Law § 45.23."

*Id.* at 592 (footnote omitted; emphasis added). Next, we considered the furnishing of equipment to be neutral; although the claimant furnished her own car and a notebook for displays, the company supplied the free gifts and contract forms. Lastly, we considered the company's right to terminate the claimant:

> "The agreement signed by claimant when she was hired indicated that her 'authorization to represent is subject to withdrawal as a consequence of a violation' of its various provisions prohibiting false or misleading representations and failure to return materials and proceeds. An unqualified right to fire, indicative of an employer-employe[e] relationship, must be distinguished from the right to terminate the contract of an independent contractor for bona fide reasons of dissatisfaction. The exercise of such a right is still consistent with the idea that a satisfactory end result is all that is aimed for by the contract. *Marcum v. SAIF*, [29 Or App 843, 847, 565 P2d 399 (1977)]; 1C Larson, Workmen's Compensation Law § 44.35. No evidence was offered here that the employer could discharge claimant for other than violations of their agreement."

*Id.* at 592-93.

We concluded our analysis by quoting a "remarkably similar" case from New York "in which, according to Larson, 'every fact relating to control was overwhelmingly on the side of independent contractorship' ":

> " '[The claimant] "was [to be] free to exercise her own discretion and judgment with respect to the persons from which she would solicit applications and with respect to the time, place and manner of solicitation"; her payment was by commission, not by time; she paid her own expenses and used her own car; she was not required to make any report of her activities or to attend any meetings, although meetings were held which she could attend if she wished; she had no office space: the company, after her initial training period, did not in fact exercise any control over her work, beyond limiting her to a certain territory and forbidding her to sell competing insurance; and, for good measure, the written contract said explicitly that she should not be an employee but an independent contractor. * * *' 1C Larson, Workmen's Compensation Law § 43.54, citing *Gordon v. New York Life Ins. Co.*, 275 App Div 135, 89 NYS 2d 83 (1949), *rev'd*, 300 NY 652, 90 NE2d 898 (1950)."

*Henn*, 60 Or App at 593.

D. *Control over the manner in which services are provided*

According to Avanti, the facts found by the ALJ and other undisputed facts in the record demonstrate, as they did in *Henn*, that Waiau was free from the direction and control of the company she represented. We agree.

As noted, OAR 471-031-0181(3)(a) provides that Waiau was "free from direction and control" only if she controlled both the manner and the means of her work. Addressing the manner in which Waiau provided services first, the rule defines the manner" of work as "the method by which services are performed." OAR 471-031-0181(3)(a)(B). The key is whether she determined "how to perform the work." *Id.* The rule, consistently with the "right to control" case law, specifically references that the "manner" by which services are performed can include "work schedules" and "work processes and procedures."

We conclude that the undisputed facts establish, just as in *Henn*, that Waiau controlled when and how often she

worked. Waiau set her own schedule—days and hours—and, as the ALJ found, "in practice Waiau could decide how frequently to visit customers." The fact that Waiau's agreement required her to visit Avanti customers at least once every twelve weeks is not, as the Employment Department now contends, indicative of the "right to control" the manner in which Waiau performs. *See, e.g., McQuiggin v. Burr*, 119 Or App 202, 207, 850 P2d 385 (1993) ("Under her contract, she was required to go to each location two times a month and to make the visits at least 12 days apart. Those circumstances are not indicative of 'employee' status."); *see also Jenkins*, 245 Or at 385-86 ("It is undisputed that the salesmen were free to keep such hours, work such territory, and make as many or as few calls as they saw fit. The only evidence of any kind of managerial control was testimony that the company 'expected' Conner to make ten or twelve sales per month. This expectation has to do solely with end results rather than with method.").[5]

There is little other direct evidence of Avanti's control over the work process—the method by which Waiau performed her services. There is no evidence that Waiau was required to use a specific sales technique when soliciting orders; in fact, the context of Waiau's agreement suggests the opposite. Waiau was required to undergo only a limited initial training, because she had been representing Avanti's products on behalf of One Coast long before her current

---

[5] *Jenkins* involved a question of vicarious liability and applied the "right of control" test as part of the common-law master-servant inquiry. The question whether a person is a "worker" for unemployment compensation purposes is not the same as the common-law master-servant inquiry. *See Kirkpatrick*, 247 Or at 212 (unemployment compensation act must be "construed broadly enough to include persons who, although independent contractors according to the common law test, are peculiarly subjected to the hazard of unemployment because of the nature of their occupation"). In effect, a persons who is "free from the direction and control" of an employer is an independent contractor under the traditional common-law test but might remain an employee for purposes of unemployment taxation unless the person performs the services as part of an independently established business. *See Harvey v. Employment Division*, 66 Or App 521, 523, 674 P2d 1204 (1984). In many cases involving sales representatives, courts have found it unnecessary to reach the issue of "direction and control" because the sales representatives were not able to meet that second, necessary prong of the statutory "independent contractor" test—*i.e.*, that the sales representative was engaged in an "independently established business." *See, e.g., Baker*, 240 Or at 365-66. In this case, the ALJ concluded that Waiau was, indeed, engaged in an independently established business.

agreement with Avanti. (It was, after all, only because One Coast dissolved that Waiau entered into the agreement in the first place.) Indeed, as the ALJ found, Avanti "kept its hands off Waiau's day-to-day activities as long as Waiau met her sales goals and no issues arose relating to any orders she secured." The ALJ acknowledged that "Avanti may not have actually exercised control over the manner of Waiau's [provision of] services."

The ALJ reasoned, however, that the services agreement gave Avanti "the right to control prices, products, ways, methods, terms of payment or shipment, and 'any other conditions or terms of sale,' " including the right to change those terms without notice to Waiau and the right to accept, reject, or modify any order. But as Avanti points out, the ALJ's reliance on Avanti's control over prices, shipment, and other terms of sale to find Avanti's right to control Waiau's work process ignores the nature of the services Waiau agreed to provide in the services agreement. Waiau's services were the solicitation of orders and servicing of accounts; Avanti expressly reserved the right to "accept or reject any order or to cancel or modify any accepted order * * *." In other words, Avanti did not control the manner in which Waiau set prices or accepted orders, because those were not part of her services in the first place.

In fact, that type of explicit reservation of authority—*i.e.*, a clause whereby the company reserves the right to accept, reject, or modify any order—has been viewed by the Supreme Court as evidence of independence rather than the right to control. In *Jenkins*, the court considered whether a driver, a salesperson who solicited furnace-cleaning orders for a heating company, was an independent contractor or an employee of the heating company. The relationship between the heating company and its sales staff was, with respect to the authority to bind the company, similar to the situation here:

> "Some of the company's salesmen worked door to door. Others used the telephone. All were paid on a piece-work basis, their commissions depending upon the total cash price of each cleaning order. *Commissions were not paid upon orders that were canceled by the customer or rejected by the company. The company reserved the right to reject any*

*order tendered to it for any reason it saw fit. Salesmen were authorized to negotiate with customers on the price for each job, but their latitude in this respect was limited by the company's power to reject any order."*

245 Or at 384 (emphasis added). Notwithstanding that aspect of the agreement, the court held that the facts gave rise to only one reasonable inference: that the salesperson was an independent contractor. *Id.*[6] In light of *Jenkins*, we are not inclined to read much into Waiau's inability to bind Avanti with regard to orders; that aspect of the agreement is equally consistent with an independent contractor relationship and does not demonstrate Avanti's "right of control" over the manner in which Waiau goes about soliciting those orders—the service that she agreed to provide.

The second "principal" factor that we looked to in *Henn*—the method of payment—is likewise consistent with the freedom of an independent contractor agreement, as opposed to control over the manner of performance. Waiau worked strictly as a commissioned salesperson and, as noted above, worked as frequently or infrequently as she liked. As we observed in *Henn*, "[i]t has generally been held that a commission salesman who works on a part-time basis, selling only when he feels like it or when the opportunity presents itself, is an independent contractor." 60 Or App at 592 (citing 1C Larson, Workmen's Compensation Law § 45.23).

The ALJ thought otherwise, concluding that "[e]ven the payment of Waiau's commissions was subject to Avanti's control," because Avanti could (1) delay payment to Waiau if,

---

[6] Later, in *Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 45 P3d 936 (2002), the court similarly considered whether a negligent driver was an employee of the defendant company or an independent contractor. In that case, the driver, Stockert, had a "dealership" agreement with the defendant. Stockert was required "to purchase all his meat and fish products from defendant, to promote the sale of defendant's products to Stockert's customers 'at times and in a manner within [Stockert's] discretion' * * *." 334 Or at 96-97. The dealership agreement also recited certain "understandings," including that Stockert had no authority to bind the defendant to any contracts or obligations. *Id.* The court, relying on *Jenkins*, held that no reasonable juror could conclude that the defendant retained control over Stockert. 334 Or at 103-04. Indeed, the court explained, "the facts in this case show that defendant had even less right to control its salesmen than did the defendant in *Jenkins*," in part because "the defendant in *Jenkins* reserved the right to reject, for any reason, any order its salesmen had negotiated and to refuse to pay commissions on those orders." *Id.* at 106.

"in its sole judgment," overall collections were particularly slow; (2) charge Waiau for unspecified customer deductions, returned products, and settlements with late-paying customers; and (3) resolve disputes between the division of Waiau's commissions on products delivered outside her territory. None of those aspects of the payment arrangement, however, altered the fundamental nature of the payment method: a commission on whatever sales resulted from Waiau's efforts, which in turn were a matter left to her discretion.

In sum, Avanti established that Waiau had the ability to set her own schedule, that it did not exercise actual control over how Waiau went about soliciting orders or servicing her accounts, and that it did not retain a right to exercise control over how Waiau did so through Avanti's retention of control over the terms of sale that it would accept. Accordingly, we conclude that Waiau was free from Avanti's direction and control over the manner of her work.

E. *Control over the means used to provide services*

That leaves the question of whether Avanti proved that Waiau determined the means used or needed for her work, *i.e.*, "which resources to use in order to perform the work, and how to use those resources." OAR 471-031-0181(3)(a)(A). As relevant here, the means of performing the work includes consideration of another principal factor in the "right to control" test from which ORS 670.600(2)(a)'s "direction and control" requirement is derived—the furnishing of equipment. *Henn*, 60 Or App at 592.

The ALJ recognized that Waiau furnished equipment used to perform her services—namely, her own vehicle and her own office equipment. Nonetheless, the ALJ reasoned that Avanti had provided other equipment or means by which Waiau would perform, such as "trademarks and trade[ ]name and other identifying materials," and also "order forms, price lists, catalogs, and other promotional materials for her use." But in the context of the services performed by Waiau—soliciting greeting card orders and promoting the sale of Avanti's products—we are not persuaded that a representative's use of trademarks, trade names, and other promotional material is particularly indicative of control over the means of performance. Rather, in this context,

the use of that type of promotional material is more aptly considered part of Avanti's right to specify the "desired results"—that is, those materials pertain more to *what* she solicits than to *how* she solicits.[7] Indeed, the sales representative in *Henn* used company "charts, encyclopedias and subscription contract forms" and was nonetheless held to be free from the direction and control of the company. 60 Or App at 590. *See also Great Am. Ins. Co.,* 257 Or at 66-67 ("The exercise of some limited control by the employer over the work being done will not necessarily make the worker an employee rather than an independent contractor."). Thus, contrary to the ALJ's conclusion, this factor cuts in favor of Avanti in determining whether Waiau was free from Avanti's direction and control over the means used for her work.

F.  *The right to fire*

The "right to fire" is not specifically referenced in OAR 471-031-0181 as bearing on the "direction and control" test, but courts typically have considered that among the "principal factors" in the right to control test. *Henn,* 60 Or App at 591; *see S-W Floor Cover Shop,* 318 Or at 622 ("Factors considered by the courts in determining whether a 'right to control' establishes an employment relationship have included * * * whether the employer has power to discharge the person without liability for breach of contract."). And, although the ALJ did not discuss this factor in his analysis of control, the department now argues that Avanti had the power to terminate the contract without incurring contractual liability, and that such a right to fire is itself sufficient proof of control to make Waiau an employee. *See Bowser v. State Indus. Accident Comm.,* 182 Or 42, 54-56, 185 P2d 891 (1947) (explaining that the right to fire has been found controlling in some cases; where "both parties have the right to terminate the relationship without any liability whatever," the "effect of that power possessed by the company required

---

[7] There was no evidence, for instance, that the promotional materials gave specific directions to Waiau with respect to how to solicit orders, or that Waiau was required to use the promotional materials in any particular way. Instead, Waiau had the right to use Avanti's intellectual property to promote Avanti's cards and to obtain orders, without restriction, until her business relationship with Avanti terminated.

respondent to conduct his operations at all times as it might please the * * * company and its manager").

The department is correct, in part. The services agreement between Waiau and Avanti does, in fact, include two provisions that, read together, amount to a "right to fire." Those provisions, both in paragraph 20 of the agreement, state:

"A)    Anything herein to the contrary notwithstanding, both of us shall have the right to terminate this Agreement at anytime without further liability to the other, for any reason or for no reason, upon thirty (30) days or more written notice to the other. The termination shall be effective on the date specified in the notice or, if none is specified, the date that such notice is deemed received under Paragraph 21.

"B)    Except in the case of a termination by Avanti for cause, to which the minimum thirty (30) day notice requirement in this Paragraph 20 shall not apply, Avanti shall, after the effective date of the termination, pay you the Commission (Paragraphs 7 and 9) with respect to any other [sic] for which Avanti would be obligated to pay you a Commission if the Agreement had not been terminated; provided, however, payment is subject to and conditional on such order having both been actually received and accepted by Avanti not later than fifteen (15) days after the effective date of the termination."

We are not persuaded, however, that the right to fire is dispositive in this case. Courts applying the "right to control" test have often emphasized that no one factor is necessarily dispositive, and have found an absence of control when other factors overshadow the importance of the "right to fire." In *Schaff v. Ray's Land & Sea Food Co., Inc.*, 334 Or 94, 45 P3d 936 (2002), for example, the court concluded that the plaintiff had, as a matter of law, failed to prove that a particular "dealer" for the defendant company was subject to the defendant's direction and control, despite the fact that the defendant had the right to terminate the relationship at any time without contractual liability. The court—in response to the plaintiff's argument and a dissent that emphasized the

defendant's right to fire, 334 Or at 109 (De Muniz, J., dissenting)—explained that the case was factually indistinguishable from *Jenkins,* in which the court had concluded that the evidence was insufficient to show a right to control:

> "[P]laintiff argues that the fact that the relationship between [the dealer] and defendant was terminable at will is 'consistent with an employer/employee relationship' and, thus, could support a conclusion that such a relationship existed. Again, we fail to see the significance of that fact in light of *Jenkins, where the relationship between the salesman and the furnace-cleaning company also was terminable at will. Id.* at 385."

334 Or at 106 (emphasis added).

In this case, the various facts bearing on the "right of control," with the notable exception of the right to fire, predominate in favor of the conclusion that Waiau was an independent contractor: Waiau had her own home office and vehicle; set her own hours and visited customers as frequently or infrequently as she desired; was compensated solely based on commission; communicated with Avanti concerning only the results of her efforts; and could simultaneously perform the same services for other greeting card companies. Those facts, too, must be considered in the context of the agreement itself. As noted, Waiau had been performing the same services for Avanti while she was employed by another company, One Coast; after One Coast dissolved, Waiau and Avanti entered into an agreement by which she agreed to provide the same services directly to Avanti as an independent contractor. The terms of that agreement and the parties' conduct are consistent with their express understanding that Waiau would be working as an independent contractor, not an employee subject to the company's direction and control.

Where, as in this case, the factors are stacked toward independence, Oregon appellate courts employing the "right to control" test have considered sales representatives to be "free from the direction and control" over the means and manner of soliciting orders. *See, e.g., Henn,* 60 Or App at 593. We are of the view that the legislature, by codifying that judicial test, intended the same result here. Accordingly, we conclude that Waiau was, for purposes of ORS 670.600(2)(a) and

OAR 471-031-0181(3)(a), free from Avanti's direction and control over the means and manner of her performance. The ALJ erred in ruling otherwise. We therefore reverse and remand the order for further action.

Reversed and remanded.